NOT DESIGNATED FOR PUBLICATION

**STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT**

**19-478**

**STATE OF LOUISIANA**

**VERSUS**

**JAMAL CHRISTOPHER LACON**

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR 158064
HONORABLE JOHN  DAMIAN TRAHAN, DISTRICT JUDGE

**********

**ELIZABETH A. PICKETT
JUDGE**

**********

Court composed of Sylvia R. Cooks, Elizabeth A. Pickett, and Jonathan W. Perry, Judges.

**CONVICTION AFFIRMED.  SENTENCE AFFIRMED AS AMENDED.
REMANDED WITH INSTRUCTIONS.**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT-APPELLANT:**
     **Jamal Christopher Lacon**

**Hon. Keith A. Stutes**
**Fifteenth JDC District Attorney**
**Daniel M. Landry, III**
**Assistant District Attorney**
**P. O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Jamal Christopher Lacon**
**Angola State Prison**
**Camp D, Falcon Unit -4**
**Angola, La 70712**
**PRO SE**

**PICKETT, Judge.**

## FACTS

On July 6, 2016, two males shot and killed the victim, Desmond Boutte. The males fled the scene on foot. An eyewitness told police that Raven Lamar Wiltz was one of the shooters. Within thirty minutes of the shooting, both the defendant, Jamal Christopher Lacon, and Raven Lamar Wiltz were apprehended in a nearby area and arrested for murder. Clothing that matched the description of one of the shooters as well as the guns used in the shooting were found in the area within which the defendant and Wiltz were apprehended.

On August 17, 2016, the defendant and Wiltz were each charged by grand jury indictment with one count of second degree murder, a violation of La.R.S. 14:30.1. A jury trial of both the defendant and Wiltz began on February 25, 2019, and ended on February 28, 2019, with both the defendant and Wiltz being convicted of second degree murder. On March 14, 2019, the defendant, was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence.

On March 26, 2019, the defendant filed a motion for appeal, which was granted on April 1, 2019. The defendant's appellate counsel filed a brief, alleging four assignments of error – one involving the sufficiency of the evidence, one involving the trial court's failure to dismiss two jury panels, one involving unrecorded bench conferences, and one involving the erroneous admission of evidence. The defendant also filed a pro se brief, alleging error as to the trial court's allowance of audio and video evidence in the jury deliberation room.

## ASSIGNMENTS OF ERROR

1. The evidence introduced at the trial of this case, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) standard, was insufficient to prove beyond a

reasonable doubt that Jamal Christopher Lacon committed either the offense of second degree murder or one of the lesser offenses.

2.  Appellant's right to a fair trial by an impartial jury was violated when the trial court denied the defense's requests to dismiss two of the jury panels.

3.  The trial court erred in failing to assure that discussions and arguments made during bench conferences were recorded and preserved for appellate review, thereby denying Appellant of his constitutional right to an appeal.

4.  Appellant was denied his constitutional due process rights when the trial court admitted the radio communication recording into evidence.

## PRO SE ASSIGNMENTS OF EROR

1.  The trial court abused its discretion allowing the audio and video into the deliberation room, by tainted procedures subseptable [sic] to abuse.

2.  Should Art. 793 be severed due to areas of unconstitutionality of the right to a fair trial?

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there is one error patent regarding the sentence imposed.

The trial court failed to impose the sentence at hard labor even though a sentence for second degree murder must be imposed at hard labor. La.R.S. 14:30.1. Thus, the sentence is illegally lenient. *State v. Williams*, 16-579 (La.App. 3 Cir. 4/15/17), 216 S0.3d 107. We hereby amend the sentence and order that it be served at hard labor and order the trial court to enter a minute entry reflecting this amendment.

2

## ASSIGNMENT OF ERROR NUMBER ONE

The defendant alleges the evidence was insufficient to prove the identity of the two shooters. The standard of review in a case of identification is well-established:

> "In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). . . . [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville*, 448 So.2d 676, 678 (La.1984). Furthermore, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. *State v. Weary*, 03-3067 (La. 4/24/06), 931 So.2d 297; *State v. Neal*, 00-0674 (La. 6/29/01), 796 So.2d 649. Positive identification by only one witness is sufficient to support a conviction. *Weary*, 03-3067 at p. 18, 931 So.2d at 311; *Neal*, 00-0674 at p. 11, 796 So.2d at 658; *State v. Mussall*, 523 So.2d 1305, 1311 (La.1988). It is the factfinder who weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. *State v. Bright*, 98-0398, p. 22 (La. 4/11/00), 776 So.2d 1134, 1147.

*State v. Hughes*, 05-992, pp. 5-6 (La. 11/29/06), 943 So.2d 1047, 1051 (alteration in original).

The first witness to testify at trial was Chelsey Anderson. Around 6:00 p.m. on the day at issue, Ms. Anderson drove her friend, Kelsea Bonner, to the Martin Luther King Center (Center) so that Ms. Bonner could get her car. According to Ms. Anderson, Ms. Bonner's boyfriend, Keelan, was at the Center playing basketball with his friend, Desmond. When Ms. Anderson pulled up, Desmond and Keelan walked up to her vehicle. According to Ms. Anderson, Desmond sat in the back of the car, and Keelan leaned over on the passenger-side window. While Desmond and Keelan were talking with Ms. Anderson and Ms. Bonner, two "boys" walked up from the side of the building and started shooting. Ms.

3

Anderson described the "boys" as black and as being regular height. One of the boys, Ms. Anderson testified, had "dreads." Ms. Anderson testified that one of the individuals started shooting first and then the other individual started shooting. Ms. Anderson stated that she never looked into the faces of the shooters. When asked if she remembered what the shooters were wearing, Ms. Anderson replied, "They both had on like white shirts and red. I seen one of them have on a red cap, but that's it."

The call Ms. Anderson made to 911 was played for the jury and introduced as State's Exhibit 3. The caller reported a shooting at the Center. The caller also stated that the shooters had taken off running. In the recording, the caller described one of the shooters as having a black rag around his head and as wearing black shorts. When asked if there were one or two shooters, the caller stated there were two shooters, and both of them fired shots. The caller also mentioned one of the shooters was wearing a white shirt. Although something was described as "red," it is difficult to decipher what the caller said was "red."

At trial, Ms. Anderson agreed that when she was talking to the 911 operator, she identified one of the shooters as wearing a red cap and one as having "dreads." The following colloquy took place regarding a photograph marked by the state for identification purposes:

> Q. Ms. Anderson, I have marked for identification purposes only a photograph of two individuals. Does that look like what the individuals you observed were wearing?
>
> A. It could be, yes.
>
> Q. Okay. I mean, we've got the black pants, white shirt, and we've got the individual with the hat. Is that what you observed?
>
> A. Yes.

Ms. Anderson agreed that she told police she did not want to identify the two individuals and did not want to testify. When asked why she did not want to testify, Ms. Anderson replied:

A.     Because Desmond momma buried him, and then next it would be my momma burying me, and then what?

Q.     So you were scared?

A.     Yes.

Q.     And in fact, we had to bring you here the first time this matter was set for trial, correct?

A.     Yes.

Q.     And that's because you didn't show up because you were scared?

A.     Yes.

Q.     And as we sit here today you still don't want to testify?

A.     Correct.

On cross-examination, Ms. Anderson agreed that she was arrested by the United States Marshals in Texas and extradited to Louisiana to testify. When asked if she felt pressure from the state to put "Raven's" name into this case, Ms. Anderson replied:

A.     I mean, pressured because they subpoenaed me to. I stayed in jail for eight days to testify. But not pressure like making me say this and making me say that. I don't know him.

Q.     Right.

A.     I don't know him from nobody except that day. That was my first time ever, and I don't even - - You know, I just gave a description of them. I never said his name, not even to Mr. Landry, no.

Ms. Anderson agreed that after the shooting, she was asked to look at a photo lineup but failed to identify the defendant or Wiltz. On re-direct, the following colloquy took place regarding the photo lineup:

5

Q.      Okay.  So let me ask you about these lineups.  I questioned you about these lineups when you were brought here the first time, correct?

A.      Correct.

Q.      And you actually did circle a number indicating a suspect, correct?

A.      Correct.

Q.      Okay.  And you actually circled two different ones, correct?

A.      Correct.

Q.      Those aren't the shooters that you saw that you circled, correct?

A.      I circled what I saw what resembled - - Again, I don't - -

Q.      Okay.  But I thought your testimony was you just circled it because you didn't want to even be there and talking to police.

A.      Correct.  Yeah, correct, so I circled whatever I saw that resembled them.  I didn't even look.

Kelsea Bonner testified that Ms. Anderson drove her to the Center on the night in question.  Ms. Bonner's boyfriend, Keelan, was playing basketball at the Center with Desmond Boutte.  When Ms. Bonner and Ms. Anderson drove up, both Desmond and Keelan walked up to the car and talked to the women.  Ms. Bonner testified that she saw "some guys come out a alley."  Ms. Bonner described the guys as "black," but did not offer any description as to the clothes they were wearing.  Ms. Bonner saw both individuals with guns in their possession as they were approaching. Although Desmond tried to get away, shots were fired, and Desmond fell.  Ms. Bonner did not remember if the shots were fired at the same time or separately.  After the shots were fired, the two people ran through the parking lot.

When the state asked Ms. Bonner if she told the police who the shooter was, the following colloquy took place:

6

Q.     Okay.  And did you tell him who the shooter was?

A.     No.

Q.     Okay.  So it's your testimony today you never told Sergeant Sices that Raven Wiltz was the shooter?

A.     No, but I did tell him what I observed.

Q.     Okay.  Do you know Raven Wiltz?

A.     Yes, I know him from being in the community.

Q.     Do you see him sitting at counsel table?

A.     Yes, he right here.

Q.     Okay.  He's the gentleman with the dreads?

A.     Yes.

Q.     So it's your testimony that you never told Sergeant Sices that Raven Wiltz was the shooter?

A.     No, sir.

Q.     Do you remember visiting with Sergeant Larry Theriot?

A.     No, sir.

Q.     Okay.  I mean, Detective Theriot?

A.     No, sir.

Q.     Do you remember telling him that Raven Wiltz was the shooter?

A.     No, sir.

Q.     Okay.  Do you remember coming up to the district attorney's office where Detective Theriot was in a conference room and telling him that Raven Wiltz was the shooter?

A.     No, sir.

Q.     Okay.

A.     You explained everything to me upstairs what happened and that, and I said, "Then what you need me for?"

Q.     Are you scared to tell the truth here?

7

A.    No, I'm not.

Q.    Okay.

A.    But I'm not going to put my life in danger, either.

Ms. Bonner did not remember giving Sergeant Sices a description of the clothes worn by the shooters. When asked if she remembered telling Sergeant Sices that she saw the shooting but would not give a written or recorded statement, Ms. Bonnier replied, "Yes, I did. . . . Because that's not my business."

Sergeant Thaddeus Sices of the Lafayette Police Department was working as a patrol supervisor on July 6, 2016, at 7:02 p.m. When Sergeant Sices received a call that there was a shooting in progress at the Center, he responded in a "minute or two." A large crowd surrounded Desmond Boutte, who Sergeant Sices observed lying on the ground with blood coming out of his head and torso area. Sergeant Sices began questioning individuals, one of whom was Ms. Bonner. According to Sergeant Sices, Ms. Bonner named Raven Wiltz and "another black male subject" as the shooters. Sergeant Sices then called out to the other units that one of the suspects was believed to be Raven Wiltz and that he had taken off running through fields toward Himbola Apartments.

The audio of the police radio communications was admitted into evidence as State's Exhibit 5. In the recording, the suspects, one being Raven Wiltz, were said to have run into the field, and one of the suspects was described as having a black rag around his head and wearing black shorts. One of the officers described seeing a person with a black backpack, black shirt, and khaki pants. Someone who heard the shots while working on his car saw two black males run toward Peppermill Street. Another officer stated that one of the subjects had a red bandana with corn rows. Another caller stated that a witness saw two black male subjects, one with

8

dreads, that ran through a parking lot and were trying to hide in a neighborhood. Another officer stated a witness saw the suspects go toward Super One. Officers stated that various witnesses saw the suspects heading east – both wearing white t-shirts, one wearing a red hat and one wearing a black hat. According to the witness, the suspects were walking, not running. Two individuals were spotted off of Johnny Street. One of the officers stated that a witness said one of the suspects may have been picked up in a blue vehicle. One of the suspects, according to an officer, was peeping around some shrubbery. Raven Wiltz was apprehended while the other suspect remained at large. The second suspect was detained shortly thereafter. The two suspects that were detained were named Raven and Jamal.

During his testimony at trial, Sergeant Sices identified Raven Wiltz as one of the defendants in court – the one with "dreads." According to Sergeant Sices, the two individuals detained were "Jamal" and Raven Wiltz. Sergeant Sices described the crime scene as unusually chaotic.

On cross-examination, the following colloquy took place regarding the radio communications:

> Q.   On the tape of the radio traffic did I hear correctly that somebody said one of the suspects had a black rag on their head?
>
> A.   You may have.
>
> Q.   Did I hear that somebody described the suspects as wearing a red bandana?
>
> A.   Yes, sir, I think so.
>
> Q.   Did I hear somebody say "black hat"?
>
> A.   Yes, sir.
>
> Q.   Was there also multiple communications about two suspects getting into a blue vehicle?

A.     Well, I mean, like I said, the crowd was saying - - people was coming and saying everything.  I was just reporting it as the people were telling me, you know.

Some said that he may have gotten into a blue vehicle, and some said that he - - I've had a lady to tell me that he ran into Himbola, and he was in one of the apartments, I mean, but - - You know, they was just saying some of everything out there at that time.

When asked if information was being reported over the radio as it was learned, Sergeant Sices replied:

A.     Yeah.  But the first person I went to - - I mean, the person who I knew, that I've been knowing for a long time, that person gave me information, told me who it was.  I already knew where Raven lived, so I started calling out to the other officers where he lived at and things like that.

Sergeant Sices testified that Wiltz was a student at Lafayette Middle while Sergeant Sices was a resource officer at the school.

Sergeant Benjamin Suire of the Lafayette Police Department testified that he participated in the investigation of the shooting in question.  During the investigation, Sergeant Suire learned of video footage from a camera at a business – A&L Tire.  According to Sergeant Suire, the timestamp on the video is July 6 at 6:58 p.m., around the time of the incident. The video footage was played for the jury and introduced as State's Exhibit 6.  The footage showed two black males fitting the description of the suspects walk by the business.  Still photographs were taken from the video. One of the photographs depicts an individual wearing a red hat.  Sergeant Suire agreed that this matched a description of one of the suspects. When asked to look at the second photograph taken from the video and asked if there was anything unique about the individual in the image, Sergeant Suire replied, "It appears that he's tucking an object, possibly a handgun which was reported to us, into the waistband of his pants."  On cross-examination, Sergeant Suire testified that he could not be certain that the object was a handgun but

testified that "[i]t's just consistent with what I've come across in my 23 years of law enforcement." On re-direct, the following colloquy took place:

Q.      Sergeant, you're familiar with the mechanics of a firearm?

A.      Yes, sir.

Q.      And an automatic weapon, a pistol, has the top. Do you know what that's called?

A.      Yes, sir. It's a semiautomatic weapon, but it's a slide.

Q.      A slide?

A.      Yes, sir.

Q.      This location and what appears to be the civil - - silver, would that be consistent with what a slide would look like?

A.      Yes, sir.

On cross-examination, Sergeant Suire was asked whether the video footage purported to capture the defendant and Wiltz in the moments before the shooting. Sergeant Suire replied:

A.      I don't know if it's before or after. The description we were given of the persons involved matches what I saw on video, which is why I contacted Detective Theriot, and he asked us to get a copy of the video.

When asked if one of the individuals appeared to have something white in his ear, Sergeant Suire agreed that it could have been an earbud.

Detective Adam Lefort worked in the Criminal Investigations Division of the Lafayette Police Department and participated in the investigation of the shooting in question. Detective Lefort learned of video footage at a business known as Zydeco Car Wash. The video footage was played for the jury and introduced as State's Exhibit 9. According to Detective Lefort, the individuals depicted in the video footage were consistent with the descriptions of the "shooter" in the homicide. A still photograph taken from the video was introduced as State's

11

Exhibit 10. Detective Lefort testified that one of the individuals in State's Exhibit 10 was wearing a red item around his head, "looking like a visor." Detective Lefort also stated that the individual wearing the red visor was wearing long pants. On cross-examination, Detective Lefort agreed that one of the individuals in the video footage appeared to be speaking on a cell phone. The following colloquy took place regarding the motion of the individuals in the video:

> Q. . . . . The way they ambulate from when they enter the frame to here to back, how would you describe that motion?
>
> A. Unsure of where you're going.
>
> Q. Well, I would describe that as walking. Would you agree?
>
> A. Yes.

According to Detective Lefort's report, the individuals were within the range of the cameras of the carwash for about four minutes, until 7:12 p.m. Detective Lefort agreed that the video showed the individuals go through a backyard and appear to hop over a hurricane fence. When asked if the individuals were moving at a leisurely pace the entire time they are shown in the video, Detective Lefort replied, "I don't recall seeing them running. Like you, I recall seeing them going over a fence, yeah." The following colloquy then took place:

> Q. And the whole time that we see them here they're walking. You know, they did hop the one hurricane fence, but they otherwise spend about four minutes from when they crossed Whitney Street to when they disappeared up here maybe one or two houses down on Pierce Street. Is that about your recollection?
>
> A. Yes.

Corporal Asher Reaux of the Lafayette Police Department responded to the crime scene on the night in question. Corporal Reaux testified that the area near Johnny Street was canvassed because of radio communications that someone was

12

seen on Johnny. The following colloquy took place regarding the search of the area on Johnny Street:

Q.    Doing your canvas of that area did you locate any objects?

A.    Yes, sir.  We went to the yard of a particular - - There was a trailer home with a yard, and somebody said they had seen the suspect - - last seen in that area, and we thought he had cut through the yard. So me, along with another - - a couple other officers, we got permission from the homeowner and searched the trailer to make sure nobody was inside.

And then around that time they called out on the radio that they had captured - - they had detained a suspect, like, right across the street from there, so we started searching the yard to see if he had dropped or tossed anything in the yard.

And underneath the trailer we located a red, like a headband thing, and then inside the trash can there was a pair of pants.

Corporal Reaux identified State's Exhibit 17, an "Adidas Rajun Cajun red hat band," as the item he discovered underneath the home.  State's Exhibit 18 was identified by Corporal Reaux as the pants located in the garbage can.  According to Corporal Reaux, an arm of a cactus was stuck to the pants.

Deputy Randy Meche of the Lafayette Parish Sheriff's Office testified that he participated in the investigation of the shooting at issue.  At that time, Deputy Meche worked for the Lafayette Police Department.  Deputy Meche went to 118 Johnny Street in response to a radio dispatch to the area.  Marcus Adams told Deputy Meche that there was a gun in a trash can in his front yard.  Mr. Adams told Deputy Meche that when he located the gun, he used plastic gloves to pick it up and put it in the trash can.  Mr. Adams said he was concerned for the safety of his nieces and nephews.  Deputy Meche described the gun as a Ruger LCP. Photographs of the gun were admitted into evidence as State's Exhibits 19, 20, and 21. Deputy Meche identified State's Exhibit 22 as the Ruger LCP found in the trash can, and several .380 caliber cartridges.

13

Detective Jason Migues of the Lafayette Police Department testified that he also searched the Johnny Street area the day after the shooting. According to Detective Migues, he located a gun tucked in the bushes. Detective Migues identified State's Exhibits 23 through 27 as accurate photographs of what he found in the bushes. Detective Migues also identified State's Exhibit 28 as the gun portrayed in the photographs. On cross-examination, Detective Migues testified that the gun found in the bushes was a 9mm, a common caliber handgun.

Corporal Chris Beasley of the Lafayette Police Department testified that when he arrived at the crime scene in question, it was completely chaotic, with people everywhere. According to Corporal Beasley, the crime scene had tape around it, and no one was inside the crime scene. Corporal Beasley identified photographs of items found at the scene - the victim's covered body, five shell casings, and one projectile. Corporal Beasley also identified an exhibit introduced by the state as a fragment recovered from the victim's body. Additionally, Corporal Beasley identified another fragment that was discovered at the scene. State's Exhibit 50 was identified by Corporal Beasley as contact swabs taken from items of evidence and from the suspects for DNA testing. The pants, red visor, and guns previously introduced into evidence were identified by Corporal Beasley as items that he collected and processed for DNA testing as well.

Clothing collected from both the defendant and Wiltz was identified by Corporal Beasley as items collected into evidence. The first bag, Corporal Beasley agreed, belonged to the defendant and contained a pair of purple shorts, a white t-shirt, and white earbuds. The second bag, Corporal Beasley agreed, contained black shorts, a white t-shirt, a lighter, a charger, and white earbuds that belonged to Wiltz. Finally, Corporal Beasley identified photographs of the defendant and

14

Wiltz taken at the Lafayette Police Department. According to Corporal Beasley, buccal swabs were taken from the defendant and Wiltz for DNA testing.

On cross-examination, Corporal Beasley identified a black Nissan in one of the photographs. Corporal Beasley believed the vehicle belonged to the victim. According to Corporal Beasley, the Nissan was removed from the scene and taken to the Lafayette Police Department, where it was searched. When asked what he found while searching the vehicle, Corporal Beasley replied, "Two boxes of PPU .223 cartridges, one Glock magazine containing .40 caliber hollow-point cartridges." Additionally, when asked if the Glock magazine had a number of rounds, Corporal Beasley responded:

> A.     There was three PPU .40 caliber full metal jacket - - full metal jacket cartridges, and two Browning BXP .40 caliber hollow-point cartridges, and eight - - a total of eight.
>
> Q.     And where were those two items found - - well, excuse me, three items? Two boxes of .223 rounds and the one Glock magazine, where were each of those found?
>
> A.     The .223 cartridges were found in the tire well in the trunk, and the Glock magazine containing the cartridges was found in the glove box.
>
> Q.     Did you, in your investigation of that vehicle, notice a bullet hole in the front of that vehicle?
>
> A.     I believe it was in the front center.
>
> Q.     Okay, yes. I don't know if it was in your report, but that would - - that would serve your recollection correct, that there was a bullet hole in the front center of the vehicle. Did you investigate that bullet hole any further?
>
> A.     If I recall, I believe we determined it to be an old bullet hole.
>
> Q.     And not part of that - - that incident?
>
> A.     Correct.

Corporal Beasley agreed on re-direct examination that no weapons were found in the vehicle.

Officer William White of the Lafayette Police Department was meeting with his narcotics agents on Willow Street when he heard radio communications regarding the shooting at issue. Officer White heard radio communication that two black males were running on Willow toward Super One. Officer White then observed two black males walking casually. Officer White testified that the individuals showed no sense of urgency or nervousness. When asked if he remembered what they were wearing, Officer White replied, "I remember it was something red. I can't remember if it was a bandana or a visor. I believe it was white shirts." Officer White observed the individuals go through a fence area, which was a commonly used access route to the adjacent neighborhood. When asked if something happened to change his perception of the individuals, Officer White replied, "Oh, yeah," and the following colloquy ensued:

Q. And what was that?

A. The next radio traffic.

Q. And the next radio traffic indicated what?

A. The red. And I can't - - I think it was a visor. And once we had that visor I was like, okay, with the information we initially had, two black males running on Willow towards Super 1, these individuals walking with the red visor, that kind of heightened up our suspicions that these could be the possible suspects involved in the shooting.

Q. Okay. So what did you do then?

A. So me and Agent Benoit got in my unit. We left the parking lot. We drove very fastly [sic] to this shopping center right here, because I know from years of working here that this little cut-through, there's not a whole lot of land to cover before you start hitting MLK Drive.

So we positioned right here in the parking lot. The other agents, I believe, were all in the same vehicle. They positioned probably two blocks on Essie Street.

Q. Did you at some point start observing these individuals again?

16

A.     Yes.

Officer White identified his location on a photograph, and the following colloquy continued:

Q.     Okay.  And this accurately depicts where y'all were located, looking back towards this trailer?

A.     Correct.

. . . .

Q.     Tell the members of the jury what you observed as y'all were sitting there.

A.     So once Agent Benoit and I got in position in our vehicle in the shopping center our focus was, hey, where did these guys go.  When we looked across the street we see the green trailer, and I could see - - Because there was no skirting on the trailer I could see legs moving back and forth rapidly.

At times they would disappear, which I would believe that would be an obstruction either like a stairwell or something that would obstruct as far as why I'm not seeing the legs.  But they kept going back and forth.

So we're watching this and we started seeing the marked patrol units responding or, you know, skirting the area to look for these potential suspects, and at the point a marked unit is observed traveling up Martin Luther King toward Frontage Road - - toward the Thruway.

And at that time we see an individual peeking left to right of the corner of the trailer, I guess to see if the coast was clear, because it wasn't like, hey what's going on, it was scanning left and right.

After that occurred and the marked unit kind of disappeared, that's when Mr. Wiltz starts jogging toward our location, not knowing where we're at - - or not knowing who we are.

Q.     And you're not in a marked unit or - -

A.     Un-unh (no), I'm in an unmarked unit.  But it wasn't a sprint, it was just basically, I need to hurry up and get across the road.  And we took him down in the parking lot.  And once he - - once we asked him who he was, he said Raven Wiltz.  That's the name we had.

Q.     And that was the name that had been given to y'all?

A.     Correct.  Over the radio transmission, yeah.

Q.     So y'all - -

A.     Yeah, so once we take him into custody I know that the other team is nearby, so I instruct them, "Look, you need to proceed toward this trailer and start sweeping the curtilage and land area to locate that additional subject." And they had; they located him.

And after we got everybody secured we started getting information, "Hey, we've got some items discarded in a trash can, as well as on the ground," the red visor.

Q.     And that was in the area that you saw these two individuals?

A.     Correct, yeah, where all the foot traffic was behind the trailer.

Officer White identified Wiltz as a person in the courtroom "sitting at counsel table."

Corporal Christina Strong worked as an undercover narcotics officer for the Lafayette Police Department on the day in question. Corporal Strong was parked in an unmarked vehicle in a parking lot behind 220 West Willow Street. Corporal Strong heard radio communications regarding the shooting and heard that the suspects were being pursued. Several minutes later, Corporal Strong received a description of the suspects—two black males, both wearing white shirts and dark-colored pants, and one possibly wearing a red hat. When asked if they observed any individuals, Corporal Strong replied:

A.     Yes, we did. So our building is here, and there's a library. Walking from between some of these buildings we did observe two individuals fitting that description. They passed through the buildings and they passed right near our vehicles to a little opening in the fence line here going to Johnny Street.

Q.     Okay. So did you know - - did you actually observe the two individuals?

A.     I did.

Q.     Did you notice anything unusual about them?

A.     Yes. When they came on the parking lot it appeared as if they had been running; both of them were sweating profusely, and they were moving fast. We don't think at that time they knew that we were

18

police officers because we were all in plain clothes. But they were very cautious whenever they passed us to come and go around where our vehicles were and not straight through our vehicles to the fence.

Q. So did you get any further information that caused y'all to relocate?

A. They gave the description again which fit, and then somebody gave a last location of where they saw them running. And it was in our area where they lost them near Willow Street, and then they said they were passing Patterson. And they gave us the general area where they were going towards, which is the time we realized that those were the guys that had just walked passed us.

Q. So what did you do?

A. We all got in our vehicles. I was in a vehicle with Officer Jeremy Dupuis. He was driving; I was in the passenger seat. We left. We went to Willow Street because there's a big, wooden fence, so we couldn't just go straight through. So went around Willow Street. Some of our people stayed on that parking lot.

We were basically trying to kind of set up a perimeter because we were going to assist patrol, you know, direct them to come. I put on an outer carrier vest which stated, "Metro Narcotics" on it. It's our ballistic vest that we put on over our plain clothes. We turned onto Martin Luther King from Essie Street headed towards the Frontage Road.

One of the individuals then ran across Martin Luther King almost into Sergeant Will White's vehicle where he was on the parking lot, because he was coming in to set the perimeter, as well.

At which time he was getting him on the ground Jeremy then stopped the vehicle, and I could see one of the suspects coming towards our vehicle. I exited the vehicle, held him at gunpoint. He immediately complied; got on the ground. I handcuffed him. Patrol arrived, and we left.

Q. The individual that you handcuffed and took into custody, who was that?

A. Mr. Lacon.

Corporal Strong identified the defendant in court.

When asked if she remembered what the defendant was wearing when he was arrested, Corporal Strong testified, "White shirt, dark pants." Corporal Strong also stated that the defendant was walking on the side of a trailer.

On cross-examination, Corporal Strong was asked if she remembered speaking to the victim, Desmond Boutte, on March 16, 2016, about shooting Raven Wiltz's brother. Corporal Strong replied, "I do remember the case. I don't remember the specific - - the specifics of that."

Detective Brandon Stith of the Lafayette Police Department was accepted as an expert in digital forensics. Detective Stith performed a forensic investigation of Wiltz's cell phone, which was admitted into evidence as State's Exhibit 64. Detective Stith identified a report that was generated as well as videos and photographs taken from the phone. According to Detective Stith, there was a video on the phone concerning the use of a firearm. Detective Stith also identified a still photograph that captured a gun in the Wiltz's hand. Finally, some text messages were published to the jury as State's Exhibit 65. Some of the text messages referred to the fact that "Desmond" had bonded out of jail.

Detective Larry Theriot of the Lafayette Police Department responded to the shooting at issue. When Detective Theriot arrived at the scene, he was advised that the suspects were two black males wearing dark/black pants and white shirts. Additionally, one of the shooters was described as having a red cap and dreadlock-style hair. Pictures of the defendant and Wiltz taken at the police station were introduced into evidence as State's Exhibits 53 to 61. According to Detective Theriot, State's Exhibits 53 through 57 appear to be Wiltz and State's Exhibits 58 through 61 appear to be the defendant. Wiltz appears to have dreadlocks, but the defendant does not.

Multiple witnesses, Detective Theriot testified, reported that one of the shooters was Raven Wiltz. According to Detective Theriot, he was advised that two suspects matching the clothing descriptions of the shooters were found near Johnny Street and Martin Luther King, Jr. Drive. The suspects were identified as

20

Raven Wiltz and the defendant. According to Detective Theriot, he was told that a

Ms. Bonner named Raven Wiltz. The information provided was consistent that the

suspects had run through the field toward the apartments.

Detective Theriot testified that he spoke with Ms. Bonner, who stressed that

she would not provide a written and/or recorded statement and that she would not

look at a photo lineup. When asked if she identified a suspect and described how

the shooting occurred, Detective Theriot replied:

> A. Yes, sir, she did identify one of the suspects by name. She said that she knew a Raven Wiltz. I believe she said she went to either high school or middle school with him. She advised - - I'm trying to pull from memory without looking at the report - - that the suspects had approached from what would be the tennis/basketball court area.
>
> She said that they were by a friend's vehicle, that the suspects had approached and someone tried to intervene and say, "Look, don't shoot, there's too many people around." The shooting still occurred.
>
> And I want to look at exactly what I had put. She said - - she stated that Raven Wiltz shot Desmond Boutte several times, and once his body hit the ground the second suspect who was unknown to her shot him, Boutte. Stated the suspects ran towards 804 Martin Luther King Drive. And again, she - - I indicated that she refused to look at any photographic lineups and refused to cooperate out of fear.

Detective Theriot also spoke to Ms. Anderson, who said that she had

witnessed the shooting firsthand. Detective Theriot read the following from his

report, which Detective Theriot testified was typed immediately after speaking

with Ms. Anderson:

> A. "At 2217 hours Chelsey Anderson arrived at Lafayette Police Department to speak with me. She advised that she was afraid to give a written and/or recorded statement. She stated that she would tell me what she saw.
>
> "She stated that Desmond Boutte was squatted down on the passenger side of Kelsea's vehicle. She saw three males approach from the tennis courts of the Martin Luther King Center walking past the basketball courts.
>
> "When the male with the dreadlocks brandished a pistol the third male ran away. The two - - " I have "reening" - - must be a

21

typographical error. "The two reening suspects approached Desmond, and another male shouted at the suspects not to shoot in this area due to the high volume of people.["]

"The male with the red cap and dreadlocks shot Desmond anyway multiple times in the legs and back. Once Desmond fell to the ground and tried to get back up the second male shot multiple bullets into the head of Desmond. Chelsey stated that both males ran to the - - both males then ran to the tall grass of the MLK Center and bedded down."

Detective Theriot also met Officer Reaux on Johnny Street, where Detective Theriot saw a large cactus with broken pieces near a trailer. Officer Reaux showed Detective Theriot a trash can containing a pair of dark-colored pants with cactus pieces stuck in them. The trash can was located on the backside of the trailer. A red visor, Detective Theriot testified, was found under the trailer. According to Detective Theriot, the area was canvassed again the following morning, at which time two firearms were recovered near the Johnny Street area. Video footage was also found at multiple locations, specifically a tire shop and the Zydeco Car Wash. When asked if the video was consistent with the descriptions, Detective Theriot replied:

A.    Yes, sir. From the interviews I had done the night before, from having seen the subjects that had been detained firsthand, knowing their physical descriptions from having met them in person and seeing what they were physically wearing, yes, sir.

Q.    So you actually had an opportunity to see them at the police station the night of their detention?

A.    Yes, sir.

When asked if he observed any injuries or items on the clothing or bodies of the defendant or Wiltz, Detective Theriot replied:

A.    Yes, sir. When I spoke with Mr. Wiltz I do remember in his hair there were, like, bottle caps from, like, a beer bottle or a glass bottle that were folded into pieces of his hair. And one of his legs - - I don't recall from memory. One of his legs had what looked like a barb from a cactus in it or some sort of little vegetative bar, for lack of a better - - barb, for lack of a better term.

Mr. Lacon, I remember, had an injury on one of his hands, and I believe he told me it had come from a fence. It appeared - - There's a photograph of it. He appeared to have it in two different spots on the hand, kind of near the thumb and kind of near this portion here on his hand. I don't remember if he had any other injuries, off the top of my head, sir.

Detective Theriot testified that both individuals were arrested for second degree murder and then identified both the defendant and Wiltz in court.

On cross-examination, Detective Theriot agreed that he and Detective Josh Strong discussed as a possible motive for the shooting in question that the victim had been investigated for the shooting of D.D. Wiltz in March. Detective Theriot read the following from a report of the shooting:

A. "Mr. Boutte stated that the next day, March 19, 2016, he observed Mr. Wiltz walking on Jones Street." I'm going to skip forward to the next sentence. "While Mr. Boutte was driving his vehicle, Mr. Boutte stated that he pulled his vehicle near Mr. Wiltz. Mr. Wiltz lifted his shirt and began grabbing at a pistol. Mr. Boutte stated that he was in fear of his life, so he shot Mr. Wiltz and fled the scene."

Detective Theriot also testified as to his conversation with the Wiltz on the night of the shooting at issue in the present case. Defense counsel questioned Detective Theriot about his report. Detective Theriot agreed that the report stated that Wiltz denied being at the Center. Additionally, Wiltz told police that he did not know where the victim was at the time of the incident. According to the report, Wiltz stated that the puncture wound in his left leg was from a fence. Wiltz told police that when he woke up on July 6, 2016, he met with "Jamal." Wiltz then stated that he and Jamal went to St. Anthony Park and then to Johnny Street to meet Marcus, Jr. Detective Theriot agreed that a Marcus that lived on Johnny Street contacted police. Wiltz explained, "He saw a cop car, thought he had a warrant, so he ran and was detained by police." Additionally, Detective Theriot testified regarding the text messages from Wiltz's phone that were introduced as

State's Exhibit 65. Detective Theriot read a particular text message that read, "Walking to Girard. Bout to see what it's looking like. I'ma [sic] holler at you later, bro." When asked if the text was referring to Girard Park, Detective Theriot responded:

> A. There's maybe a Girard Street, a Girard woods, a Girard crossing, but generally that's all around that same area of Girard Park.
>
> Q. Right. Okay. Do they have basketball courts at Girard Park?
>
> A. I believe they do.

When introducing the defendant's Exhibit 8, defense counsel explained:

> MR. BENEZECH: So again, Google Map just indicating that Girard Park is 2-1/2 miles away from my client's house, and he walks all the way to Girard Park to play basketball. We'll combine it with the State's evidence of his test [sic] message communication.

When asked if the arrest on Johnny Street happened within ten minutes of the shooting, Detective Theriot replied, "It was fairly quickly. I don't remember what the arrest or detain time was, but if [sic] was fairly quickly." According to Detective Theriot, within thirty minutes of the shooting, the defendant and Wiltz were detained and being transported to the police department. Detective Theriot agreed that the Johnny Street scene was not monitored between the night of the shooting and the canvassing that occurred the following morning.

Detective Theriot agreed his report stated that multiple witnesses named Raven Wiltz as one of the shooters. According to Detective Theriot, one of the city marshals reported that an anonymous caller stated that "Daravius" of "201 DeLord Street" was one of the shooters. Detective Theriot did not think anyone went to the DeLord Street address. As for the photo lineup, Detective Theriot testified that a few hours after the shooting Ms. Anderson was shown a photo lineup of Wiltz and a photo lineup of the defendant but was unable to select either the defendant or Wiltz.

24

As for the injury to the defendant's hand, the following colloquy took place:

Q.     You spoke yesterday about - - at least you testified yesterday that you believe that Mr. Lacon had cut his hand while jumping a fence; is that correct?

A.     Yes, sir.  He had multiple injuries.  It could be from - - It was some sort of sharp object trauma, and it was a large wound.  I even remember holding up the picture showing that there were multiple punctures - - puncturing wounds, I would say.

Q.     It looked like a scrape on his hand?

A.     It looked like something punctured, and there was some lifted skin.  I don't remember which photograph it was, but it's a very close shot of just the hand.  I remember even indicating in my report that he was brought to be medically cleared for the cactus/fence injury or fence/cactus injury.

Detective Theriot was questioned as to the video footage from Zydeco Carwash.  Detective Theriot agreed that the individuals in the video footage appeared to be jumping a fence and appeared to be walking, not running.

On re-direct, Detective Theriot agreed that his report stated that Wiltz confirmed his address was 201 Delord Street, the same address given for "Daravius," the possible shooter named by an anonymous caller.  Detective Theriot also confirmed that Wiltz did not have a twin.  Additionally, Detective Theriot agreed that Wiltz admitted he met with Jamal on the day of the shooting.  As for the victim's previous shooting of Wiltz's brother, the following colloquy took place:

A.     "Mr. Boutte then admitted to me that he shot Mr. Wiltz on Jones Street and that Mr. Wiltz attempted to shoot him on Carver Street the day prior.

"Mr. Boutte stated that on March 18, 2016, he was standing on Carver Street at a friend's house and observed Mr. Wiltz driving a silver truck on Carver Street.  Mr. Boutte stated that Mr. Wiltz then produced a firearm and began shooting at him."

Q.     So we've got Mr. Boutte shot at one day, the next day he shoots the defendant's brother, and then the next thing we know, Desmond Boutte is gunned down and killed, correct?

25

A. Correct.

Phillip Stout, a forensic chemist with the Acadiana Crime Lab, was accepted as an expert in firearms analysis. Mr. Stout agreed that the guns collected by the police and the cartridges collected from the crime scene were provided to the lab. According to Mr. Stout's report, he received one box marked "122 1/2 Johnny" that contained one "Lorcin, model L9MM, 9mm Luger caliber pistol[,]" and one box marked "110 Johnny" that contained one "Ruger, model LCP, .380 Auto caliber pistol[.]" (State's Exhibit 73.) Mr. Stout testified as follows:

A. So based on that analysis I was able to determine that the jacketed bullet, item 6 - - Let's see. I'm sorry. The jacketed bullet, item 12, and the cartridge cases, items 1 through 4, were identified as having been fired from the Lorcin pistol which was item 9.

The .380 auto caliber cartridge case, item 5, was identified as having been fired from the Ruger pistol, item 10.

Q. And so you basically - - The casings that were recovered at the crime scene coordinated with the two guns that were recovered - -

A. Correct.

When asked if in his professional opinion, the cartridges found at the crime scene as well as the fragments belonged to the two guns recovered, Mr. Stout replied, "Yes, that's correct."

Chau Nguyen, a forensic DNA analyst with the Acadiana Criminalistics Laboratory, was accepted as an expert in forensic DNA analysis. Ms. Nguyen testified that she examined a DNA swab from the visor introduced in the present case and a DNA swab from a pair of pants. Ms. Nguyen testified as follows as to her scientific conclusions:

A. Okay. For item 24 which was the swab of the sweatband - - And the sweatband is the inside rim of like a baseball cap or a visor. So that was the area that we tested. The conclusion is a mixed DNA profile consisting of at least three contributors. Most likely one major

contributor and at least two minor DNA contributors was obtained from the swab of this sweatband.

The profile of the major DNA contributor matches the DNA profile obtained from the reference sample of Jamal Lacon. I apologize if I'm pronouncing that wrong. In the absence of identical twins it can be concluded that to a reasonable degree of scientific certainty Jamal Lacon is the source for the major DNA contributor profile found on this item.

The profile from the minor DNA contributor is a mixed partial profile. Raven Wiltz, Marcus Adams and Desmond Boutte are excluded as possible contributors to this mixed partial minor DNA contributor profile.

As for the waistband of the pair of pants, the defendant was identified as the major DNA contributor. Ms. Nguyen agreed that the defendant's DNA was on the hat and the waistband of the pants. The rest of the items either contained no DNA or DNA that was too incomplete to make a comparison. According to Ms. Nguyen, some samples were sent to TrueAllele for further analysis. When asked if TrueAllele was a way to further process DNA samples to determine statistical probabilities, Ms. Nguyen responded, "Yes, for mixture samples and partial samples."

Carolyn Booker of the Acadiana Crime Lab was accepted as an expert in DNA analysis. Ms. Booker explained that the "TrueAllele software attempts to . . . take the raw DNA data and separate out the components or separate out the two contributors so that we can then compare it to the reference samples from individuals." Ms. Booker testified that she is certified in using the TrueAllele software and testified that quality assurance testing is performed on the program to assure accuracy in results. When asked to explain how the TrueAllele testing is different than the testing performed by Ms. Nguyen, Ms. Booker replied:

A.     Well, what Chau did is she actually did actual DNA testing. She took the swabs or whatever happened to be the substrate that the DNA was on and she actually processed to get a DNA profile or get a type from the swab, and she did a comparison to the references. And

she compared the single source, meaning there was only one person or one contributor to the DNA profile.

Where it gets more complicated is when there is a mixture of DNA containing two or more contributors, so that's where we use the TrueAllele software. And it's a much more complete and unbiased way to do a comparison. And we've been doing it about a little over two years at the lab.

Ms. Booker testified that Ms. Nguyen obtained "several mixtures." The first one examined by Ms. Booker was a swab of the trigger guard of the Lorcin pistol. According to Ms. Booker, the results of her analysis on this particular swab were as follows:

A.     Jamal Lacon is 7,300 times more likely than a personal match to an unrelated individual and a match between a second inferred contributor profile. And Raven Wiltz is 950 times more probable than a coincidental match to an unrelated individual.

The swab from the sweatband of the hat, Ms. Booker testified:

A.     Okay. A match between one of the inferred contributor profiles that Jamal Lacon is 320 trillion times more probable than a coincidental match to an unrelated person. And there was no match support to Raven Wiltz, which basically means he was excluded from the mixture.

As to the waistband of the pants, Ms. Booker determined:

A.     Okay. The waistband. A match between one of the inferred evidence profiles, and Jamal Lacon is 100 billion times more probable than a coincidental match to an unrelated individual. And there was no match to Raven Wiltz, which basically means he was excluded.

Finally, Ms. Booker explained the results that the TrueAllele System generated from a swab of the "right slide" of the Ruger pistol:

A.     Yes. There was a match between the - - one of the evidence profiles. And Jamal Lacon, that was 16,000 times more probable than a coincidental match to an unrelated individual. And there was no match support for Raven Wiltz.

By stipulation, the parties admitted the coroner's report without calling the coroner as a witness. According to the report, the victim died from gunshot wounds to his head and his extremities.

28

Wiltz's sister, Megan Wiltz, testified for the defense regarding text messages she received from Wiltz about "Desmond" getting out of jail. Megan was shown State's Exhibit 65 and identified her old telephone number on the log of communications. Megan testified as follows regarding the text messages between her and Raven:

A.    I said, "That boy out there."

Q.    And he texted back, "Who?"

A.    And I said, "Desmond out.  Piss me off."

Q.    Now, you were upset that Desmond was out after he shot your brother?

A.    Yes, sir.

Q.    How many times did Desmond shoot your brother?

A.    Seven.

Q.    And then Raven asked, "He bonded out?"

A.    Yeah.

Q.    And then you say?

A.    "I guess so.  That shit ain't cool, and my brother locked up."

Q.    Which brother were you talking about being locked up?

A.    The one he shot.

Q.    And what is his name?

A.    Devante.

Q.    And he goes by D.D.?

A.    Yeah.

Q.    So D.D. was locked up having been shot seven times and Desmond was out - -

A.    Yes, sir.

Q.　- - at this point in June of 2016?  All right.  Raven says, "Can't help him, though.  We out struggling - - out here struggling,"  I take that to mean.  "I'm still trying to get all my shit."  And then you respond?

A.　I say, "I'm talking about Desmond out."

Q.　And then you also say?

A.　I said, "Watch your back.  Call Darrin 'cause you by yourself."

Q.　All right.  Now, what did you mean by that, "Desmond is out.  Watch your back . . ."?

　　. . . .

A.　Well, I was just telling him to watch his back.

Q.　You were just telling him to watch his back.  And is it because you were scared that - -

A.　Uh-huh (yes), be careful, you know.

Q.　- - that Desmond was going to shoot Raven?

A.　Right.

Q.　Okay.  All right.  Then Raven says, "And I'm talking about D.D., I ain't worried 'bout that nigga 'cause when I see him he knows what's good."

The defendant argues the state failed to prove beyond a reasonable doubt that he participated in the shooting and had the specific intent to kill the victim, Desmond Boutte.  He argues that although numerous persons were nearby at the time of the shooting, no one identified the defendant as one of the shooters.  Although two males were seen walking in an area within walking distance of the shooting, the defendant contends the males did not act suspiciously.   As for the dark pair of pants with cactus spines attached to them found in a garbage can near a trailer and the red visor found under the trailer, the defendant contends there is nothing nefarious about a person throwing away pants that had been pricked by cactus spines.  The defendant further contends the visor could have been thrown

under the trailer out of frustration "because of the cactus incident or even fallen off during a struggle to take the pants off without causing injury."

Since the evidence linking the defendant to the second degree murder of the victim is circumstantial, the following the standard of review applies:

> When the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that the state "must exclude every reasonable hypothesis of innocence" in order to convict. *State v. Camp*, 446 So.2d 1207, 1209 (La.1984). "Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir.1983). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. *State v. Williams*, 13-497 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024.

*State v. Baumberger*, 15-1056, pp. 10-11 (La.App. 3 Cir. 6/1/16), 200 So.3d 817, 826–27, *writ denied*, 16-1251 (La. 5/26/17), 221 So.3d 859, *cert. denied*, ___ U.S. ___, 138 S.Ct. 392 (2017).

Despite the lack of any eyewitness identification of the defendant as one of the shooters, the circumstantial evidence presented by the state proved beyond a reasonable doubt that the defendant was one of the shooters and excluded all reasonable hypotheses of innocence. Ms. Anderson testified that there were two shooters – black males wearing white shirts and one wearing a red cap. Ms. Anderson's testimony was clear that both of the men shot at the victim. The jury also heard Ms. Bonner testify that two black males carrying guns approached the victim before shots were fired and then ran after the shots were fired. According to Sergeant Sices, Ms. Bonner named Wiltz as one of the shooters. Although Ms. Bonner denied at trial that she named Wiltz as one of the shooters, the jury

apparently believed Sergeant Sices. When Wiltz talked to police after he was arrested, he denied being involved in the shooting but told police that "Jamal" was with him. The defendant does not dispute that he is the "Jamal" to whom Wiltz referred. Thus, the evidence showed the defendant was with Wiltz – a person named as one of the shooters. There was also evidence that Wiltz had a motive to kill the victim since the victim shot Wiltz's brother only a few months before on March 16, 2016.

Video footage from businesses in the area of the shooting showed two black males fitting the description of the shooters walking, cutting through yards, and jumping over fences within minutes before and after the shooting. One of the suspects appeared to put an object that looked like a gun in his pants. Police in the area also reported seeing the individuals casually walking at times but moving fast and sweating profusely at another time. Detective Theriot testified that the individuals shown in the video footage matched the description of the suspects and matched the defendant and Wiltz as they appeared at the police station the night of their arrests. When the defendant was arrested, he had a cut on his hand that he told police was caused by him jumping a fence.

Although the defendant was not wearing a red cap/visor when he was arrested, a red visor and dark-colored pants, both containing the defendant's DNA, were found in the vicinity of a trailer at which the police saw two individuals moving around. The dark-colored pants containing the defendant's DNA had a piece of cactus stuck to them, which apparently came from a big cactus located next to the trailer. Both of these items matched the description of clothing worn by one of the shooters. Wiltz also had cactus thorns stuck in his leg when he was arrested. Police saw Wiltz peek around the corner of the trailer right before he ran across the street to an unmarked police unit and was arrested. The defendant was

also seen walking near the trailer and arrested shortly thereafter by another unmarked police unit in the same area.

Moreover, the guns used in the shooting were both found near the trailer where the clothes were discarded and near the location the defendant and Wiltz were arrested. In response to a call from Marcus Adams that a gun was in a trash can in his front yard, Deputy Meche went to 118 Johnny Street and found the Ruger in a trash can. The Lorcin 9mm Luger pistol was found in bushes located at 122 1/2 Johnny St. When defense counsel questioned one of the deputies about his search of the area where the clothing was found, defense counsel referred to the area being canvassed as 122 Johnny Street. A comparison of the picture of the green trailer where the clothing items were discarded and a picture of the bush in which the Lorcin pistol was found suggests the bush was near the green trailer. State's Exhibit 24 shows the bush as being near a white tent/gazebo, which appears to be the same white tent/gazebo behind the green trailer pictured in State's Exhibit 16. The bush in which the Lorcin was found is visible behind the tent/gazebo, which is located behind the green trailer as pictured in State's Exhibit 16. According to the firearms analysis expert, both the Lorcin pistol and the Ruger were connected to the cartridges and fragments found at the crime scene.

Finally, DNA evidence linked the defendant and Wiltz to the guns found. Ms. Booker, an expert in DNA analysis testified that the defendant was 7,300 times more likely to be a match to the DNA swabbed from the Lorcin pistol than a coincidental match to an unrelated individual. Wiltz was 950 times more likely to be a match to the DNA swabbed from the Lorcin pistol. As for a DNA swab of the Ruger pistol, the defendant was 16,000 times more probable to be a match than a coincidental match to an unrelated individual.

This court has stated the following regarding a jury's rejection of a defendant's hypothesis of innocence:

> With respect to a jury's rejection of a hypothesis of innocence, our supreme court in [*State v.*] *Calloway*, [07-2306 (La. 1/21/09),] 1 So.3d [417] at 422 (citations omitted), concluded:
>
>> [W]e have repeatedly cautioned that due process, rational fact finder test of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), does not permit a reviewing court to substitute its own appreciation of the evidence for that of the fact finder or to second guess the credibility determinations of the fact finder necessary to render an honest verdict. A reviewing court may intrude on the plenary discretion of the fact finder "only to the extent necessary to guarantee the fundamental protection of due process of law." Thus, as Judge Pettigrew emphasized, when a jury reasonably and rationally rejects the exculpatory hypothesis of innocence offered by a defendant's own testimony, an appellate court's task in reviewing the sufficiency of the evidence under the Due Process Clause is at an end unless an alternative hypothesis "is sufficiently reasonable that a rational juror could not 'have found proof of guilt beyond a reasonable doubt.' "
>
> The jury's decision to reject the defendant's hypothesis regarding the commission of the crime was based upon its rational credibility and evidentiary determinations. Accordingly, the jury's verdict should not be overturned.

*State v. Jackson*, 14-9, pp. 12-13 (La.App. 3 Cir. 6/18/14), 146 So.3d 631, 639, *writ denied*, 14-1544 (La. 2/27/15), 159 So.3d 1066 (fourth alteration in original).

Likewise, the jury's rejection of the defendant's hypothesis of innocence in the present case was based upon its rational credibility and evidentiary determinations. Both the defendant and Wiltz denied that they were involved in the shooting. Throughout their cross-examination of the witnesses, attorneys for both the defendant and Wiltz attempted to discredit police investigation of the case, implying that the police did not talk to all the potential witnesses and ignored possible suspects. During his closing argument, Wiltz's attorney suggested that both the defendant and Wiltz were innocently in the area of the shooting when they

34

heard the commotion at the Center. When they saw the victim's car and knew that he was the one that shot Wiltz's brother three months earlier, they decided to leave for fear that the victim would see them and start looking for them. Wiltz's attorney suggested that the defendant and Wiltz went to see a friend on Johnny Street. When their friend was not home, they tried to go into his bedroom window, at which time the defendant got a cactus stuck in his leg. Embarrassed and mad, the defendant threw his hat, pulled off his pants, and threw the pants in the trash.

Defense counsel further suggested that word of the arrests of the defendant and Wiltz spread, and the real shooters decided to plant the guns at the Johnny Street scene, which was left unattended overnight. The DNA evidence from the guns, defense counsel argued, amounted only to a probability, which is not enough to convict. Defense counsel argued that the defendants' DNA would have been all over the guns since they were supposedly sweating profusely.

The jury heard this hypothesis of innocence and obviously rejected it. Considering the evidence presented by the state, the jury's rejection of this hypothesis of innocence was reasonable. Accordingly, the evidence was sufficient to convict the defendant and this assignment of error lacks merit.

### ASSIGNMENT OF ERROR NUMBER TWO

The defendant alleges his right to a fair trial by an impartial jury was violated when the trial court denied the defense's requests to dismiss two of the jury panels.

The initial question to the first panel of prospective jurors was whether anyone knew either the defendant or Wiltz. The first juror called upon by the trial court was Mr. Spears. Mr. Spears was questioned as follows:

THE COURT : How do you know the defendants?

MR. SPEARS (NUMBER 327) : Well, I work in -- I work in corrections. So Mr. Jamal, like I dressed him this morning. And Mr. Wiltz, I know him because --

THE COURT : Hang on.

MR. SPEARS (NUMBER 327) : Okay.

THE COURT : Hang on. I'm going to excuse you, Mr. Spears, because this is a criminal case in which the sheriff's office or other law enforcement agencies are involved.

MR. SPEARS (NUMBER 327) : Yes, sir.

Counsel for the defendant then asked to approach. The court acquiesced, and a bench conference was held. Afterwards, jury selection resumed.

At the conclusion of the day's proceedings, counsel for the defendant stated he would "like to proffer an objection." He pointed out Mr. Spears's statement about dressing the defendant. He then noted:

I filed a motion last week requesting that my client, at least, appear in civilian clothing without restraints, which was requested and a common practice, and those laws are very well stated in juris prudence [sic].

And although I think maybe the potential jury didn't quite understand the impact that a statement like that could have at the beginning of voir dire would prejudice my client unduly.

We had a sidebar. I gave this objection to the attention of the Court.

The court noted counsel had made a contemporaneous objection, and defense counsel continued: "Secondly, as part of the same objection, when we returned from break the defendants had not been pulled back in before the jury was brought in and seated. So they got the [sic] witness, my defendant, having to come in because he had been escorted out, with an officer." The court pointed out that it observed the defendant return from the conference room with counsel, co-counsel, and two sheriff's deputies. The objection continued:

36

MR. EDWARDS : Yes, I think there was a smaller impact to that issue, still prejudicial. These things add up, and I think we just need to be a little more careful in trial when we're doing these things.

But I want to definitely note my objection as to both --

. . . .

MR. EDWARDS : -- and request that those jurors be removed for cause because of that outburst.

Counsel for Wiltz joined in the objection.

The state argued Mr. Spears was not an officer of the court, and his response was not elicited by the state. The state further argued:

It did not appear, in my observation, the jurors, nor did it come up any other time in voir dire as to any detrimental prejudiced [sic] comments as to the defendants.

In addition, there was no objection made about the incident that he's talking about. I did not even observe that. But it was clear to me from the extensive voir dire that was done by all parties that there was no prejudice to the defendants.

The court stated:

I think that even if a defendant inadvertently or otherwise appears before a jury in prison garb, it doesn't necessitate a mistrial, and it wouldn't necessitate sustaining a cause challenge for anybody who might have seen it.

I really doubt whether anybody noticed it, and I'm convinced that with the opportunity to examine the panel by all counsel that there wasn't any prejudice to the defendants.

So I'll deny the motion, Mr. Edwards.

On the second day of voir dire, Ms. Hetherwick, who was on the second jury panel and the first prospective juror to be questioned that day, was asked about her employment at the sheriff's office as follows:

THE COURT :

What's your position there?

MS. HETHERWICK : (NUMBER 265)

37

I'm a transitional coordinator for the re-entry program. I was actually transitional coordinator for --

THE COURT :

Okay. All right. Well, I have a policy of always excusing law enforcement officers from criminal juries. I'm sorry that you've had to endure all that time downstairs in the assembly room and also up here today. But when I saw that you were employed by the sheriff's office, I told counsel that I'm [sic] going to excuse you. But thank you and, hopefully, you'll be called to do your civic duty on a civil jury sometime.

A bench conference followed.

During a ten-minute recess later in the day, counsel for Wiltz discussed Ms.

Hetherwick as follows:

MR. BENEZECH : On the questioning of Juror Number 265, that's Ms. Hetherwick, she is an officer for the sheriff's department. She works at the jail, at LPCC. She is involved in programs and release procedures. It was brought to the attention of the Court prior to any questioning of her that she may have information related to the continued custody of my client and she revealed some of that information to the panel.

THE COURT : I think what happened was that I had advised counsel before we even examined this panel that she was a law enforcement officer, and I was going to excuse her. And I thought I would head off the problem we had yesterday by addressing it and asked her what -- in what capacity did she work for the sheriff's office, and I think she volunteered that she was in the transitional programs or whatever and had some dealings with one of the defendants; I don't know which one.

MR. BENEZECH : My client, Mr. Wiltz.

THE COURT : That would -- that could call to the attention of the other jurors that they were incarcerated which would not shock them, I don't think, and I don't think it would prejudice them, but I note your objection and your motion would be for the excusal of the entire panel?

MR. BENEZECH : That's correct, Your Honor.

THE COURT : I'm going to deny that motion but note your objection.

38

The defendant contends the trial court erred in denying his requests to dismiss the two jury panels. The defendant cites La.Code Crim.P. art. 419(A), as follows:

> A general venire, grand jury venire, or petit jury venire shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systematically excluded from the venires solely upon the basis of race.

The defendant also cites La.Code Crim.P. art. 771, which provides:

> In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
>
> (1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
>
> (2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
>
> In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

The defendant further cites La.Code Crim.P. art. 775, which provides, in part: "Upon motion of a the defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771."

The defendant asserts that he was stripped of any pretense that he was a free man based on Mr. Sharp's remarks. The defendant suggests that questioning the prospective jurors about whether they heard the remarks and whether they were

prejudiced by those remarks would have unduly highlighted the fact that he was incarcerated.

The defendant claims the comments by Mr. Spears combined with his escort by deputies destroyed the presumption of innocence he sought by wearing civilian clothing. Moreover, once he was escorted by the deputies, the deputies' appearance in the courtroom served as a constant reminder that he was not a free man, bringing into the trial an unacceptable risk that impermissible factors played a part in the jury's verdict. The defendant alleges this issue was further compounded by the comments of Ms. Hetherwick, a member of the second jury panel.

The defendant cites the law regarding mistrials. However, he did not move for a mistrial. Counsel for the defendant merely asked that the first jury panel be dismissed for cause. "Where the defendant does not request a mistrial and no grounds exist for the trial court to order a mistrial *sua sponte*, the trial court does not err in failing to grant one." *State v. Day*, 14-708, p. 9 (La.App. 3 Cir. 12/23/14), 158 So.3d 120, 128. In *State v. Green*, 10-791, p. 15 (La.App. 4 Cir. 9/28/11), 84 So.3d 573, 583, *writ denied*, 11-2316 (La. 3/9/12), 84 So.3d 551, the fourth circuit stated: "At no point in the instant case did either defense counsel move for a mistrial in connection with his objections to the prosecutor's alleged improper argument. Therefore, the defendants were not entitled to any relief under La.C.Cr.P. art. 770."

The defendant cites La.Code Crim.P. art. 419, which addresses dismissal of a petit jury venire, in support of his claims. Assuming the motion to dismiss the first jury panel for cause was appropriate under La.Code Crim.P. art. 419, there was no attempt by the defendant to meet his burden of proving irreparable injury because he did not question prospective jurors regarding Mr. Sharp's comment or request an admonishment be given by the court. *State v. Hall*, 43,125 (La.App. 2

Cir. 6/4/08), 986 So.2d 863, *writ denied*, 08-1511 (La. 3/13/09), 5 So.3d 116; *State v. McSweeney*, 619 So.2d 861 (La.App. 3 Cir. 1993). Moreover, the defendant did not discuss La.Code Crim.P. art. 797, which addresses challenges for cause.

In *State v. Young*, 469 So.2d 1014 (La.App. 1 Cir. 1985), the defendant argued the trial court erred by failing to summon a new jury venire or grant a mistrial because the current venire had been tainted by prejudicial comments and newspaper reporting. During voir dire, several prospective jurors stated they believed the defendant was guilty based on information received from media reports. After the first two of those jurors had been excused, the defendant moved for a new jury venire to be impaneled due to the impact of those statements. The trial court denied the motion. At the conclusion of jury selection, the defendant again objected to the jury venire. The supreme court addressed the defendant's claims:

> The setting aside of a jury venire is properly raised by a motion to quash, not by objection. LSA–C.Cr.P. art. 532; *State v. Charles*, 350 So.2d 595 (La.1977). However, we observe that if the attack upon the petit jury venire were properly made, it is without merit. *State v. Francis*, 285 So.2d 191 (La.1973).
>
> The defense was entitled to challenge for cause those prospective jurors who stated that they had been influenced by this testimony, or who had formulated an opinion as to the guilt or innocence of the accused. The transcript of the voir dire indicates that the trial court carefully monitored the responses by the prospective jurors, and excused any jurors who might possibly have been influenced by statements indicating any preconceived opinions. To quash the entire venire on the basis of exposure to one source of information would seem a meaningless gesture, particularly when the voir dire process remains available. *State v. Bland*, 419 So.2d 1227 (La.1982). Barring a showing of actual bias or lack of impartiality, the defendant's objection to the jury venire was properly denied.
>
> Defendant further contends the trial court erred in failing to grant a mistrial, based on the same allegations of a tainted jury. Defendant herein did not request a mistrial. He does not show that the statements by the prospective jurors made it impossible for him to obtain a fair trial or operated as a legal defect in the proceedings. LSA–C.Cr.P. art. 775. The record establishes that the jurors selected

were fair and impartial. The trial court did not err by failing to grant a mistrial.

*Id.* at 1019-20.

In *State v. Price*, 40,408 (La.App. 2 Cir. 12/16/05), 917 So.2d 1201, *writ denied*, 06-156 (La. 6/16/06), 929 So.2d 1284, a sheriff's deputy was called in the general venire as a prospective juror. When questioned by the state, he said he worked at the Ouachita Parish Correctional Center, so he knew the defendant. Counsel for defendant moved for a mistrial, which was denied. The second circuit addressed the motion for mistrial as follows:

> Here, Deputy Bagwell's unsolicited comment about "knowing" the defendant from "OCC" was made during the third panel of eighteen prospective jurors. As soon as Deputy Bagwell made the comment, defense counsel requested a side bar, interrupting any further remarks, and the court immediately halted voir dire. When voir dire resumed, Deputy Bagwell was not questioned any further. The record shows that all parties thoroughly examined each prospective juror, and no one was questioned regarding whether they heard Deputy Bagwell's comments. Defense counsel had the opportunity to examine the remaining members of the venire regarding the comments, and had the opportunity to challenge for cause anyone who may have heard the comments. Yet, the defense failed to do so.

> Moreover, the trial court determined that the instructions to the jurors at the beginning and at the close of the case would be sufficient to cure the prospective juror's "almost passing reference." Under these circumstances, we find no abuse of the trial court's discretion in denying the defendant's motion for mistrial.

*Id.* at 1213-14.

In *Hall*, 986 So.2d 863, a prospective juror stated the defendant scared her. The prospective juror was removed for cause. The defendant argued the entire panel of prospective jurors should have been excused, as the prospective juror's comment was highly prejudicial and tainted the entire panel. Thus, the defendant was prevented from receiving a fair trial. The second circuit cited La.Code Crim.P. art. 419, noted the defendant had the burden of proof, and continued as follows:

[M]istrial is a drastic remedy that is warranted only when the defendant has received substantial prejudice such that he cannot receive a fair trial. [*State v. Carmouche*, 01-0405 (La. 5/14/02), 872 So.2d 1020]. A court need not order a new trial absent a showing that the prospective juror's comments affected other jurors and prejudiced the defendant. *Id.* The decision to dismiss the venire rests within the trial court's discretion. *Id.*; *State v. Weary*, 2003-3067 (La.4/24/06), 931 So.2d 297, *cert. denied*, 549 U.S. 1062, 127 S.Ct. 682, 166 L.Ed.2d 531 (2006). Ordinarily, proof of prejudice consists of further examination of the other venire members. *State v. Weary*, *supra*; *State v. Scroggins*, 40,746 (La.App. 2 Cir. 3/22/06), 926 So.2d 64, *writ denied*, 2006-0980 (La.11/3/06), 940 So.2d 655. An admonition to the other venire members may also cure any potential prejudice. *State v. Price*, 40,408 (La.App. 2 Cir. 12/16/05), 917 So.2d 1201, *writ denied*, 2006-0156 (La.6/10/06), 929 So.2d 1284.

In front of 11 other venire members and in response to a question by defense counsel, Ms. Reynolds stated, "Just be looking at him, I will be biased. * * * I promise, he scare [*sic* ] me just by looking at him." Both the state and defense challenged Ms. Reynolds (and one other juror) for cause; the district court excused them. When the court asked for peremptory challenges, defense counsel moved to strike the entire panel because the jurors were tainted by Ms. Reynolds's remark. The court offered to conduct individual voir dire of several jurors to see if they were affected, but defense counsel replied, "There's nothing the court can do to undo that [the prejudice]." The court orally denied the motion, stating there was nothing in the record to show that the remaining jurors were tainted.

Hall's argument is nothing more than a conclusory assertion that Ms. Reynolds's remarks tainted the venire. He expressly declined further voir dire, a procedure normally used to show prejudice in this situation. *State v. Weary*, *supra*; *State v. Scroggins*, *supra*; *State v. Rubbicco*, [550 So.2d 219 (La.App. 4 Cir.1989), *writ denied*, 556 So.2d 1258 (La.1990)]. He also did not request an admonition, an additional curative procedure. *State v. Price*, *supra*. Notably, Ms. Reynolds voiced no opinion as to Hall's guilt or innocence and apparently did not attempt to influence the other jurors. A fair reading of the voir dire is that Ms. Reynolds was simply trying to get out of jury service, an attitude which may well have influenced the other jurors to pay her absolutely no mind. On this record we cannot state that the court erred in refusing to dismiss the venire. This assignment lacks merit.

*Id.* at 871 (third and fourth alterations in original).

In *McSweeney*, 619 So.2d 861, the defendant was on trial for distribution of both marijuana and cocaine. During jury selection, a prospective juror was overheard saying that "'if they would take some of those drug dealers and shove

about one-half pound of cocaine down their throat, it would stop some of this crime.'" *Id.* at 867.  The trial court refused to quash the entire jury venire based on the statement, and the defendant raised the issue on appeal.  This court addressed the matter, stating:

> Generally, when a prospective juror makes a comment which arguably taints a panel or venire, the defendant moves for a mistrial or admonition pursuant to LSA-C.Cr.P. Art. 771 or 775.  See *State v. Kohler*, 434 So.2d 1110 (La.App. 1st Cir.1983).  The defendant also may request a challenge for cause.  In the present case, the defendant did not request a mistrial, nor admonition, but requested that the entire venire be quashed.
>
> LSA-C.Cr.P. Art. 419 limits the grounds for quashing a petit jury venire. . . .
>
> Defendant failed to establish irreparable injury due to the alleged statement and failed to show that the statement tainted the entire panel.   In fact, the only other witness to Moses's remark did not recall it. Without supporting evidence, we cannot say that the trial court abused its discretion in denying defendant's motion to quash the petit jury venire.

*Id.* at 867-68.

In *State v. Kinchen*, 290 So.2d 860 (La.1974), the court addressed the denial of a motion to excuse the entire jury venire on the ground that the defendant was denied the presumption of innocence when he was brought into the courtroom handcuffed and in prison garb.  Before the case was called for trial, while the court was handling preliminary matters, the defendant and another accused were brought into the court by sheriff's deputies.  The men were dressed in prison garb and handcuffed.  They were seated in the jury box where all prisoners were seated during the morning hour.  At that time, some or all members of the jury venire were seated in the spectator seats of the courtroom.  The defendant was in the courtroom for ten minutes before the judge became aware of his presence.  The defendant was immediately returned to jail to be dressed in civilian clothes.

Defense counsel subsequently moved, outside the presence of the jury venire, to excuse the entire venire. The supreme court addressed the issue:

In *State v. Spencer*, 257 La. 672, 243 So.2d 793 (1971), the defendant was brought into the courtroom in handcuffs before the voir dire examination of the prospective jurors. The handcuffs were removed as soon as the prisoner was seated and were not replaced during the trial. A defense motion to disqualify and discharge the jury venire was denied. No voir dire examination was directed to whether the prospective jurors had seen the defendant while manacled or were in any way adversely impressed by his appearance. In the absence of any showing of prejudice, we held that the judge did not err in his ruling.

The fact that the defendant was escorted out of the courtroom in handcuffs in the full view of the jury on one occasion did not vitiate the conviction in State v. Crockett, 262 La. 197, 263 So.2d 6 (1972). Cf. State v. Boudoin, 257 La. 583, 243 So.2d 265 (1971). See also: Thomas v. Beto, 474 F.2d 981 (5th Cir. 1972); Bentley v. Crist, 469 F.2d 854 (9th Cir. 1972); Hollins v. Beto, 467 F.2d 951 (5th Cir. 1972); United States v. Rickus, 351 F.Supp. 1386 (E.D.Pa.1972); Moffett v. State, 291 Ala. 382, 281 So.2d 630 (1973); Boswell v. State, 290 Ala. 349, 276 So.2d 592 (1973); People v. Earl, 29 Cal.App.3d 894, 105 Cal.Rptr. 831 (1973); People v. Herman, 512 P.2d 1159 (Colo.1973); Scott v. State, 504 P.2d 10 (Nev.1972); State v. Doby, 18 N.C.App. 123, 196 S.E.2d 377 (1973); Vavra v. State, 509 P.2d 1379 (Okl.Cr.1973); McGregor v. State, 491 S.W.2d 619 (Tenn.Cr.App.1973); Pittman v. State, 488 S.W.2d 89 (Tex.Cr.App.1972); State v. Archuletta, 28 Utah 2d 255, 501 P.2d 263 (1972).

Several factors convince us that this trial should not be set aside on the mere showing that defendant was brought into court for a brief ten minutes before trial during a morning hour while members of the jury venire were in the courtroom. In his per curiam the trial judge stated that no prejudice to the defendant was shown. Appellant did stand trial in civilian clothes without handcuffs. No effort was made by defense counsel to ask members of the jury venire on voir dire whether they recognized defendant as the same person who had been in court earlier in handcuffs and prison garb during a busy morning hour when many distractions may otherwise have held their attention. There is no adequate showing that the handcuffs were conspicuous or that the prison garb was noticeably different from civilian garb such as to draw the attention of the jury and create an impression which was detrimental to appellant. There is no evidence that the jury which tried appellant recognized him as the handcuffed party in the jury box prior to trial.

These are the areas in which the discretion of the trial judge is called into play. To find an abuse of that discretion requires a clear showing in the record. And it is only when the abuse of that discretion reaches

a point where the trial becomes a farce and fairness is impossible that grounds are furnished for a mistrial. La.Code Crim.Proc. art. 775; McCloskey v. Boslow, 349 F.2d 119 (4th Cir. 1965); State v. Tennant, supra.

*Id.* at 862-63.

In *State v. Wilkerson*, 403 So.2d 652 (La.1981), the defendant alleged the trial judge erred in permitting him to be handcuffed in the presence of the jury. Trial had adjourned for the day. However, before the jury was able to leave the courtroom, a member of the sheriff's office handcuffed the defendant and his co-defendant. More than half of the jury passed within three or four feet of the defendant. The supreme court addressed the defendant's complaint:

> Ordinarily, a defendant before the court should not be shackled or handcuffed or garbed in any manner destructive of the presumption of his innocence and of the dignity and impartiality of judicial proceedings. *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); *State v. Clark*, 340 So.2d 208 (La.1976); *State ex rel. Miller v. Henderson*, 329 So.2d 707 (La.1976). However, exceptional circumstances may require, within the discretion of the trial court, the restraint of the prisoner for reasons of courtroom security or order or where the prisoner's past conduct reasonably justifies apprehension that he may attempt to escape. *State ex rel. Miller v. Henderson*, supra; *State v. Daniel*, 297 So.2d 417 (La.1974).

> If the handcuffing is objected to at the time of trial, for a finding of reversible error the record must show an abuse of the trial court's reasonable discretion resulting in clear prejudice to the accused. *State ex rel. Miller v. Henderson*, supra.

> In the instant case, the defendant's apparent disregard for the authority and lives of police officers would suggest that some security measures were in order. Further, the defendant and his co-defendant were not handcuffed during trial. They were handcuffed solely for purposes of transport to and from the courtroom. Under the circumstances, the possibility that on one occasion several jurors may have seen the defendant in handcuffs does not appear to have so prejudiced the defendant as to warrant relief on appeal.

*Id.* at 659.

Based on the cases cited herein, the trial court did not err in denying the defendant's request to dismiss the first jury panel for cause because Mr. Spears said he dressed the defendant that morning.

As for the defendant's complaint that he was escorted by deputies in the presence of the jury, the minutes of court for February 25, 2019, do not reflect any breaks or recesses other than the recess at the end of the proceedings. The transcript indicates a ten-minute recess was taken well into questioning of the jury panel. Questioning resumed thereafter. Subsequently, several prospective jurors were questioned privately in the deliberation room. The defendant was not present at that time. Thereafter, the defendant entered the deliberation room, and the parties exercised challenges to the prospective jurors. Proceedings subsequently resumed in the courtroom. After all jurors were excused, defense counsel made the above-referenced objections. In the pertinent objection, defense counsel said the issue occurred when "we returned from break." He did not mention when that occurred. The only break referenced in the transcript was on page 171, and the objections began on page 196.

In *State v. Williams*, 03-1773, pp. 7-9 (La.App. 3 Cir. 6/2/04), 878 So.2d 765, 770-71, this court discussed contemporaneous objections as follows:

> Louisiana Code of Criminal Procedure Article 841 states in pertinent part, "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." Defendant cites *State v. Lee*, 346 So.2d 682 (La.1977) to say that the error must be brought to the judge's attention within a reasonable time. In *Lee*, the defendant was being retried after the supreme court reversed his conviction. At the second trial, during questioning of one of the witnesses, the prosecutor referred to the date of the first trial and mentioned there was a conviction. No objection was made by defense counsel at this point. During the state's rebuttal closing argument, the prosecutor again referred to the first trial and the fact there was a conviction. Shortly after these references, defense counsel objected and moved for a mistrial. On appeal, the state argued defense counsel's objection was untimely. The supreme court stated the issue to be decided was whether the belated motion for mistrial, made after

47

repetition of an unobjected-to error, could be considered in the absence of an objection to the first improper reference. The court stated:

> Article 841 is not an inflexible rule imposed on criminal litigants without rationale or justification. It is necessary adjunct to our role as an appellate court which is intended to promote judicial efficiency and to insure fair play. See *State v. Smith*, 339 So.2d 829 (La.1977[1976]); *State v. Ervin*, 340 So.2d 1379 (La.1977[1976]); *State v. Marcell*, 320 So.2d 195 (La.1975). For example, its operation prevents a defendant from gambling for a favorable verdict and then, upon conviction, resorting on appeal to errors that could have been corrected at trial, had he but brought the errors to the judge's attention. *State v. Smith*, *supra*; *State v. Knight*, 323 So.2d 765 (La.1975); *State v. Marcell, supra.*

> . . . .

What our rules require is that counsel bring an error to the attention of the trial judge within a reasonable time after the error occurs so that he can cure the error or declare a mistrial. C.Cr.P. arts. 770, 771, 841. Generally, a contemporaneous objection must be made immediately. In certain instances, however, objections which come shortly thereafter will be considered timely, see *State v. Foss*, 310 So.2d 573 (La.1975), and there are even instances in which no objections are required because they would be a vain and useless act, see *State v. Ervin, supra*. Particularly may there be such exceptions to the general rule during closing argument for reasons expressed in the following law review comment:

> "one must recognize that the closing argument of the prosecutor may be so permeated with improprieties that constant objections may alienate the jurors or underscore the remark rather than erase it from their minds. Therefore, an objection at the end of the summation should be considered timely, and in some cases should be allowed outside the presence of the jury." (citations omitted) 34 L.L.Rev. 746, 759 (1974).

> Moreover, we recognize that a prosecutor's prejudicial comments in closing argument may be considered by a federal court to violate federal due process guarantees even in the absence of a defense challenge or objection at trial. *United States v. Briggs, supra*, 457 F.2d 908 (2d Cir.1972); *United States v.*

*Grunberger*, 431 F.2d 1062 (2d Cir.1970); *United States v. Sawyer*, 347 F.2d 372 (4th Cir.1965).

> The only effect we can see in counsel's failure to promptly request relief was that the trial was unnecessarily continued beyond a point when it should have been aborted. We do not find that sufficient reason to bar defendant from making a later motion when the error was blatantly repeated. Therefore we hold that the trial judge erred in refusing to grant defendant a requested mistrial when the prosecution during rebuttal argument stated and stressed that defendant Lee had been convicted of this very murder on an earlier trial of the case.

*Id.* at 684-85.

In the other case cited by Defendant, *State v. Mullins*, 537 So.2d 386 (La.App. 4 Cir.1988), the defense made an objection at the close of the state's closing argument. For the reasons discussed in *Lee*, the court found the error was preserved for appeal.

The year after *Lee* was decided, the supreme court dealt with this issue in *State v. Sepulvado*, 359 So.2d 137 (La.1978). In *Sepulvado*, the defendant contended on appeal that the trial court erred in allowing the state to question the victim about acts of sexual intercourse with the defendant other than the one at issue. During trial, the victim testified regarding two instances of sexual intercourse with the defendant. The prosecutor then asked her if she subsequently had sexual relations with the defendant. At that point, defense counsel objected. The supreme court held the objection came too late and the issue could not be raised on appeal.

A similar conclusion was reached by the supreme court that same year in *State v. Brown*, 354 So.2d 516 (La.1978). In *Brown*, during the cross-examination of witness Simmons, the prosecutor arguably made a reference to the witness' post-arrest silence. However, the supreme court found the objection to the question was not timely because it was not made until the prosecutor concluded two pages of cross-examination concerning the subject. Thus, the defense was not allowed to raise the error on appeal.

Considering the foregoing cases, as well as the cogent facts of this case (the statement made by Gallington is separated by a substantial amount of testimony, two courtroom breaks, much more than an hour, and thirty-five pages of transcript from the objection to motion for mistrial), we find that the objection was not timely made and, therefore, Defendant has not preserved this issue for appeal. Thus, this assignment of error is without merit.

Based on *Williams* and the cases cited therein, we find the objection as to the defendant's escort by sheriff's deputies was untimely. Moreover, based on the cases addressing handcuffed defendants, the defendant cannot prove he was prejudiced by being escorted by deputies in the presence of the jury, especially considering he was on trial for second degree murder.

As to the defendant's request to excuse the second jury panel for cause. The defendant was represented at trial by Evan Edwards and Jim Brazee and Wiltz was represented by Benny Benezech. The motion to excuse was made by Mr. Benezech and was not adopted by counsel for the defendant at the time it was made. Moreover, there was no objection by the defendant as to Ms. Hetherwick. Thus, the defendant waived review of this claim. La.Code Crim.P. art. 841.

For the reasons asserted herein, the defendant's second assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER THREE

The defendant argues the trial court erred in failing to assure that discussion and arguments made during bench conferences were recorded and preserved for appellate review, thereby denying the defendant his constitutional right to appeal. He asserts that several bench conferences were held during the trial, but not all were memorialized by later comments on the record.

First, he notes the record indicates a bench conference was held during jury selection. The bench conference was followed by the trial court's statement to the jury that at the request of the lawyers, it would instruct the jury as to proper juror conduct. The defendant's appellate counsel asserts that since the bench conference was not transcribed, she could not assess whether a potential error occurred for purposes of assignments of error on appeal. The record does not state whether or not the bench conference was recorded, and the defendant asserts only that the

50

bench conference was not "transcribed." There was no request to supplement the record with the transcription of the bench conferences, which would have prompted this court to order the court reporter to transcribe the bench conference. Thus, there has been no showing this particular bench conference was unrecorded as opposed to simply untranscribed.

The second bench conference to which the defendant refers is a bench conference held during the questioning of Sergeant Sices. When the state announced that it was going to play the radio communications for the jury, the defendant's attorney requested a bench conference. After the bench conference, the state questioned Sergeant Sices about what he had observed and heard when he arrived at the scene. The radio communications were then played for the jury, and Wiltz's attorney stated they would save their objection until they were outside of the jury's presence. The defendant argues the following:

> As the State changed its direction in questioning after the bench conference, it appears that defense counsel raised an objection to the playing of the radio communication. However, without a transcription of the conference, appellate counsel can only assume that an objection was raised and what the court's ruling was to the objection. Later, counsel objected on the record to the recording. However, it is unclear whether the parties were memorializing the earlier bench conference or expressing a new objection. When the court asked if there was an objection to the admission of the recording (St. Exh. 5), one of the defense attorneys noted that he would make his objection outside the purview of the jury. (II,p.415). (Also see the next assignment of error). In the event the court concludes that the later stated objection was not timely raised, failure to record the bench conference would result in actual, not just perceived, prejudice to Appellant.

As with the previously discussed bench conference, the record does not state whether or not this bench conference was recorded. Since it is not clear that the bench conference was not recorded, and the defendant has not requested supplementation of the record with the transcribed bench conference, there has

been no showing this particular bench conference was unrecorded as opposed to simply untranscribed.

The state contends the defendant fails to establish that the lack of transcription of the bench conferences constitutes a material omission, and contends the defendant fails to allege how the lack of transcription affected his substantial rights.    Additionally, the state asserts that because the defendant fails to articulate any prejudice, the failure to transcribe the bench conferences in the present case was, at most, harmless error.

Even if the bench conferences were, in fact, unrecorded, the defendant fails to show sufficient prejudice to warrant a new trial.  This court has stated the following regarding the standard for reviewing this type of claim:

> Louisiana Code of Criminal Procedure Article 843 requires the trial court to "record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel."

> In *State v. Pinion,* 06-2346, pp. 7-8 (La.10/26/07), 968 So.2d 131, 134-35, the supreme court concluded that "the failure to record bench conferences will ordinarily not affect the direct review process when the record suggests that the unrecorded bench conferences had no discernible impact on the proceedings and did not result in any specific prejudice to the defendant." *See State v. Castleberry,* 98–1388 (La.4/13/99), 758 So.2d 749, *cert. denied,* 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999). "The Court has instead conducted a case-specific inquiry to determine whether the failure to record the conferences results in actual prejudice to the defendant's appeal." *Pinion,* 968 So.2d at 134.

> . . . .

> Nargo maintains the contents of the non-recorded bench conferences specifically mentioned were necessary for appellate counsel, who was not trial counsel, to properly review the case for potential errors. Nargo fails to demonstrate, however, what discernible impact these bench conferences had on his trial, and, thus, there is not sufficient prejudice to warrant a new trial. This assignment of error lacks merit.

52

*State v. Nargo*, 15-779, pp. 14-15 (La.App. 3 Cir. 6/1/16), 193 So.3d 1263, 1271-72, *writ denied*, 16-1313 (La. 5/19/17), 220 So.3d 748.

Since *Pinion,* 968 So.2d 131, several cases have discussed the proof necessary to show that an unrecorded bench conference made a discernable impact on a defendant's right to appellate review. In *State v. Campbell*, 06-286 (La. 5/21/08), 983 So.2d 810, *cert. denied*, 555 U.S. 1040, 129 S.Ct. 607 (2008), the supreme court addressed Campbell's claims that transcripts of numerous court appearances, hearings, and bench conferences were omitted from the appellate record. Although Campbell's appellate counsel alleged that a complete and accurate record was needed in light of "the fact that the defendant represented himself at trial, coupled with the issues raised regarding the defendant's competency," appellate counsel offered "no suggestion or argument that the defendant was prejudiced by the record omissions." *Id.* at 873. The supreme court denied Campbell any relief based on the incompleteness of the record, finding no discernable impact on the proceedings and finding no specific prejudice suffered by Campbell based on unrecorded bench conferences.

In *State v. Troquille*, 07-1486 (La.App. 1 Cir. 6/6/08) (unpublished opinion), *writ denied*, 08-2186 (La. 4/24/09), 7 So.3d 1197, the defendant argued that the failure to transcribe bench conferences denied him the right to present assignments of error on appeal. The first circuit found the assignment of error lacked merit, stating the following:

> Herein, the defendant has failed to demonstrate any specific prejudice that he suffered as a result of the bench conferences not being transcribed. Nothing in the record suggests that the bench conferences had any discernible impact on the proceedings. The defendant has not stated any additional issue or argument that he would have raised if the bench conferences had been transcribed. Nor has the defendant developed any specific argument as to how adequate review was hindered. Accordingly, we find no reversible error in this regard. This assignment of error is without merit.

*Troquille*, 07-1486, p. 7.

Likewise, in *State v. Copp*, 08-1012 (La.App. 1 Cir. 12/23/08) (unpublished opinion), *writ denied*, 09-186 (La. 10/30/09), 21 So.3d 275, the defendant alleged his conviction should be reversed because two bench conferences were not recorded. The first circuit found no merit to Copp's request, stating the following:

> As for the content of the two specific unrecorded bench conferences, defendant has failed to demonstrate any specific prejudice that he suffered as a result of those conferences not being transcribed or recorded; nor does anything in the record suggest that the conferences had a discernible impact on the proceedings. Because of defendant's failure to illustrate how he has been prejudiced by these unrecorded bench conferences, we find he is not entitled to relief. *See State v. Hoffman*, 98-3118 at 50, 768 So.2d at 587 (finding that where defendant could point to no specific prejudice, the failure to record bench conferences did not constitute reversible error); *State v. Castleberry*, 98-1388, pp. 28-29 (La. 4/13/99), 758 So.2d 749, 772-73, *cert. denied*, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999), (stating that absence from the record of four unrecorded bench conferences did not deny defendant effective appellate review); *State v. Brumfield*, 96-2667, pp. 14-16 (La. 10/20/98), 737 So.2d 660, 669-70, *cert. denied*, 526 U.S. 1025, 119 S.Ct. 1267, 143 L.Ed.2d 362 (1999), (holding that the trial court's failure to have each bench conference and ruling properly transcribed was not reversible error when the defendant failed to show that he was prevented from presenting any relevant evidence and failed to establish that any prejudice resulted from their absence in the record).

*Copp*, 08-1012, p. 15.

In *State v. Spears*, 08-831 (La.App. 3 Cir. 3/4/09), 8 So.3d 119, this court reversed a conviction based on a deficient record. Spears argued that the record was deficient in several respects: 1) Many portions of the voir dire transcript referred to individual venire members as "prospective juror" rather than by name; 2) A number of the comments and statements made throughout voir dire were listed as "inaudible," 3) The contents of various bench conferences were not recorded; and 4) Portions of the victim's testimony and portions of the transcription of the defendant's confession were listed as "inaudible." *Spears*, 8

So.3d at 120. Although Spears alleged that it was unclear whether he used all of his peremptory challenges, this court noted that the jury strike sheets showed Spears used all of his peremptory challenges. Deciding the incompleteness of the record required Spears's conviction and sentence should be vacated, this court reasoned as follows:

> The difficulty in this case, as in *Pinion*, is the fact that the discussions of the jury challenges do not appear in the record. We find the record does not contain enough information for Defendant to effectively challenge the denials of his challenges for cause. As a practical matter, a careful reading of the revised transcript of voir dire enables a reader to identify at least some of the unnamed prospective jurors. However, any attempt at argument or review would require identification of Defendant's unrecorded causal challenges, and reconstruction of both the reasons supporting them and the reasons for the trial court's denial of them. Any such attempt would venture into the realm of mere speculation. As the current record is insufficient for practical review of the denials of Defendant's challenges for cause, Defendant's conviction and sentence are vacated and the case remanded for new trial, pursuant to *Pinion*.

*Id.* at 122.

Subsequently, this court distinguished *Spears* in *State v. L.W.*, 11-904 (La.App. 3 Cir. 6/6/12) (unpublished opinion), *writ denied*, 13-758 (La. 2/28/14), 134 So.3d 1168. In *L.W.*, the defendant argued that the record was deficient in that it failed to contain either party's challenges for cause or peremptory challenges as to any of the prospective jurors. Finding the record was not so deficient as to require remand for a new trial, this court stated the following:

> The state stresses on appeal that the defendant must establish he was prejudiced by the missing portions of the transcript, rather than asking this court to assume prejudice. *State v. Boatner*, 03-485 (La. 12/3/03), 861 So.2d 149. In further support of its argument, the state refers to *State v. Williams*, 06-1327 (La.App. 4 Cir. 1/23/08), 977 So.2d 160, *writ denied*, 08-413 (La. 10/24/08), 992 So.2d 1033, wherein the court found that the defendant was not prejudiced on appeal due to the absence of transcribed bench conferences regarding jury *voir dire*. The court noted:
>
> > as in [*State v.*] *Deruise* [, 98-541 (La. 4/3/01), 802 So.2d 1224], the transcript of *voir dire* includes the questioning

> of each prospective juror, from which it can be determined if there was a basis for any challenges for cause that the defense may have brought and may have been denied by the trial court, thereby causing the defense to exercise a peremptory challenge for a juror. A reading of the transcript of *voir dire* shows that there was no basis to excuse for cause any of the jurors who ultimately served on the jury or those whom the appellant had to excuse peremptorily.

*Id.* at 176. The court also observed that the record contained detailed jury sheets that indicated the peremptory strikes for each party as well as jurors excused for cause.

> Unlike the facts before this court in *Spears*, 8 So.3d 119, the *voir dire* transcript contains detailed discussion of the *voir dire* examinations, including all of the questions posed by the trial court and parties and the responses of the [sic] each prospective juror. Additionally, the defendant does not identify a specific juror or jurors who should not have been seated based on the information available in the *voir dire* transcript. Accordingly, we find the defendant has not established he was prejudiced by the missing transcriptions of bench conferences during *voir dire*.

*L.W.*, 11-904, pp. 13-14 (alterations in original).

Considering the vague arguments made with respect to any prejudice the defendant might have suffered as a result of the untranscribed/unrecorded bench conferences in the present case, and the lack of any indication that these bench conferences had a discernible impact on the defendant's trial, this court finds that even if the bench conferences were, in fact, unrecorded, the assignment of error lacks merit.

**ASSIGNMENT OF ERROR NUMBER FOUR**

The defendant claims he was denied his constitutional due process rights when the trial court admitted the police radio communication recording into evidence. During Sergeant Sices's testimony, the state announced that it was going to play radio communications to see if Sergeant Sices recognized the communications. The defendant's attorney asked the court, "Your Honor, may we

approach?" The record indicates a bench conference was held, after which the following colloquy took place:

Q. Sergeant Sices, let me go a little bit more into detail, and then we'll let you hear this. When you got there did you have any witnesses come forward to talk to you?

A. I was clearing out the crowd and I recognized some people there, and I started asking questions of anything they saw.

Q. You started doing police work?

A. Yes, sir.

Q. And was one of those individuals Kelsea - -

A. Bonner?

Q. Yes.

A. Yes, sir.

Q. And you spoke to her?

A. Yes, sir.

Q. And did she indicate to you who the suspect was that was involved in the shooting?

A. Yes, sir.

Q. And who did she indicate?

A. Raven Wiltz and another black male subject.

Q. All right. So at that point that you have a suspect, do you then - - You're on Charlie. What do you then do?

A. I started calling out to the other units it was Raven - - the suspect believed to be a Raven Wiltz and the way he took off running, towards Himbola Apartments through the fields.

The audio recording of the radio communications was then played to the jury. When the state offered the audio recording into evidence as State's Exhibit 5, Wiltz's attorney stated, "We'll save our objections for after - - outside the jury purview."

57

After the cross-examination of Sergeant Sices, the jury was excused for the day, and the following arguments were presented to the court regarding the audio recording:

> MR. BENEZECH [(Wiltz's attorney)]: Yes, Your Honor. The objection is based on several arguments. First, the timing of the introduction to defense; the recording was not shared with us until Monday, the day of trial.
>
> I understand that the State's attorney did not have it prior to then, but it was obviously something that was in police custody or accessible to them for the entire period that this case has been pending.
>
> Additionally, I objected because I felt like there was a lack of foundation and also a lack - - a failure under 403, Article 403 of the Code of Evidence as far as its prejudicial value versus its probative worth. There's very little gleaned from it.
>
> But what it did do was it introduced my client's name to the jury essentially within minutes of the shooting, and we feel like it didn't offer much in the way of actual probative worth because Sergeant Sices could have testified to everything that he said and everything he learned that day, even in the absence of the video - - or the audio,
>
> MR. EDWARDS [(the defendant's attorney)]: We join that same objection for the same reasons but would like to further state that, you know, this matter has been going on since July of 2016, and the first time we're getting to even hear - - we haven't even gotten a copy of it yet - - to hear it was yesterday right before trial. So I think that is beyond comprehensible why we're just getting this now.

The trial court noted the objections and admitted the exhibit.

As noted in the previous assignment of error, the defendant asserts his belief that an objection to the recording was first raised at the "unrecorded bench conference" that took place before the recording was played for the jury. It is not clear whether the bench conference was unrecorded or was simply not transcribed, and the defendant did not file a motion to supplement the appellate record with the unrecorded/untranscribed bench conference.

The defendant asserts four grounds for this assignment of error, two of which are related and will be discussed together. The defendant also claims the late discovery of the evidence prejudiced the defendant's trial preparation and his ability to either attack the evidence or present additional evidence in light of the recording. The defendant also claims the recording was exculpatory and discoverable under *Brady/Giglio*, and the state's late disclosure deprived the defendant of the opportunity to investigate the case properly. The defendant contends that information in the recording, if timely provided, would have assisted the defense in investigating the case to obtain other suspects and evidence in support of his hypothesis of innocence.

The state responds that the defendant and Wiltz were provided open file discovery, which included recaps of the radio communication records, multiple descriptions of the purported suspects, and the suspects' routes of travel, all of which were contemporaneous with the investigation. The state further notes that both eyewitnesses to the shooting as well as the responding officers testified and were subject to cross-examination. Additionally, the state contends the radio communications were offered not to prove the truth of the matter asserted but to explain the sequence of events and the course of the police investigation. Finally, the state notes that no motion to continue was filed because defense counsels knew what was on the recording from their access to open file discovery.

This court has addressed a late discovery and *Brady* claim as follows:

> In *State v. Taylor,* 12–25, pp. 18–20 (La.App. 5 Cir. 6/28/12), 97 So.3d 522, 535–36, the fifth circuit discussed alleged exculpatory evidence not disclosed as follows:
>
> > In *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that the suppression by the State of evidence favorable to the accused after it receives a request for it violates a defendant's due process rights

59

where the evidence is material to either guilt or punishment, without regard to the good or bad faith of the prosecutors. See also *State v. Bright,* 02–2793, pp. 5–6 (La.5/25/04), 875 So.2d 37, 41–42. The duty to disclose is applicable even where there has been no request by the accused. *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). The State's due process duty to disclose applies to both exculpatory and impeachment evidence. *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *State v. Kemp,* 00–2228, p. 7 (La.10/15/02), 828 So.2d 540, 545. *Brady* also requires the disclosure of evidence concerning a promise of leniency or immunity to a material witness in exchange for his testimony at trial. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763 (1972). See also *State ex rel. Guise v. State,* 00–2185, p. 2 (La.10/15/02), 828 So.2d 557, 558.

Evidence is "material" under *Brady* only if there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed to the defense. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *United States v. Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383. A reviewing court determining materiality must ascertain "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995).

While the United States Supreme Court has emphasized the prosecution's duty to disclose exculpatory evidence, it has not specifically spoken on the timing of such disclosures. But the Louisiana Supreme Court has held that late disclosure as well as non-disclosure of exculpatory evidence may deprive the defendant of a fair trial. *Kemp, supra*; *State v. Williams,* 448 So.2d 659, 665 (La.1984). *See also State v. Lande,* 06–24, pp. 23–24 (La.App. 5 Cir. 6/28/06), 934 So.2d 280, 296, *writ denied,* 06–1894 (La.4/20/07), 954 So.2d 154.

Moreover, discovery violations are not grounds for reversal unless they have actually prejudiced the defendant. *State v. Garrick,* 03–0137, p. 5 (La.4/14/04), 870 So.2d 990, 993 (per curiam); *State v. Strickland,* 398 So.2d 1062, 1067 (La.1981). Even a discovery violation involving the State's failure to disclose exculpatory

evidence does not require reversal under the Due Process Clause "unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene,* 527 U.S. 263, 281, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999).

*State v. Shupp*, 15-695, pp. 23-24 (La.App. 3 Cir. 2/3/16), 185 So.3d 900, 915-16.

Considering all the evidence linking the defendant to the shooting, the recording of the radio communications was not material to the fairness of the defendant's trial. The defendant knew from Sergeant Sices's investigation that Wiltz was identified as a shooter shortly after the shooting. Although slight variations in the descriptions of the shooters may have been relayed over the radio communications, nothing communicated over the radio was material or inconsistent with the evidence linking the defendant to the shooting. Even if the defendant would have identified and questioned some of the witnesses referred to by the police in their developing investigation of the shooting, no testimony would have diminished the evidence presented: (1) Wiltz's admission to police that he and the defendant were together before they were arrested, (2) Ms. Bonner's naming of Wiltz as one of the shooters shortly after the shooting, (3) the DNA evidence linking the defendant to clothing matching the description of one of the shooters, (4) DNA evidence linking the defendant to the murder weapons, and (5) the physical proximity of the murder weapons to the area in which the defendant and Wiltz were arrested. Thus, the defendant has failed to show the late disclosure of the radio communication recording deprived the defendant of a fair trial.

The defendant also asserts the prejudicial effect of the radio communications recording far outweighed its probative value, and the trial court failed to perform its duty as the gatekeeper of the evidence. The supreme court has stated the

following regarding the review of a trial court's determination of probative versus prejudicial value:

> Likewise, there is no merit to the defendant's contention that the statements should have been excluded for failing to satisfy the balancing test of La. C.E. art. 403. Although the district court did not specifically rule on the admissibility of the statements under La. C.E. art. 403 (perhaps because it was not asked to), the court admitted the statements, implicitly finding that their probative value substantially outweighed the danger of "unfair prejudice, confusion of the issues, or misleading the jury." La. C.E. art. 403. We find no abuse of discretion in this determination. At any rate, given the wealth of evidence of the defendant's culpability introduced into the record, any error in admitting the statements was clearly harmless.

*State v. Magee*, 11-574, p. 49 (La. 9/28/12), 103 So.3d 285, 320, n. 37, *cert. denied*, 571 U.S. 830, 134 S.Ct. 56 (2013). Likewise, considering the wealth of evidence linking the defendant to the shooting in the present case, any error in the admission of the radio communications recording was harmless error. Furthermore, the defendant was able to use the varying descriptions of the suspects mentioned during the radio communications to challenge the credibility of the police investigation.

Finally, the defendant asserts the jury should not have been given the recording during deliberations. Arguing the recording did not depict the crime or constitute *res gestae*, the defendant asserts that La.Code Crim.P. art. 793 prohibited the jury from listening to the evidence for its verbal content during deliberations. Louisiana Code of Criminal Procedure Article 793 provides as follows:

> A. Except as provided in Paragraph B of this Article, a juror must rely upon his memory in reaching a verdict. He shall not be permitted to refer to notes or to have access to any written evidence. Testimony shall not be repeated to the jury. Upon the request of a juror and in the discretion of the court, the jury may take with it or have sent to it any object or document received in evidence when a physical examination thereof is required to enable the jury to arrive at a verdict.

B. A juror shall be permitted to take notes when agreement to granting such permission has been made between the defendant and the state in open court but not within the presence of the jury. The court shall provide the needed writing implements. Jurors may, but need not, take notes and such notes may be used during the jury's deliberations but shall not be preserved for review on appeal. The trial judge shall ensure the confidentiality of the notes during the course of trial and the jury's deliberation and shall cause the notes to be destroyed immediately upon return of the verdict.

C. The lack of consent by either the defendant or the state to allow a juror to take notes during a trial shall not be communicated to the jury.

This court has held that the failure to object to an alleged violation of La.Code Crim.P. art. 793 is a trial error subject to the contemporaneous objection rule. *State v. Simon*, 10-1111, pp. 13-14 (La.App. 3 Cir. 4/13/11), 62 So.3d 318, 326-27, *writ denied*, 11-1008 (La. 11/4/11), 75 So.3d 922; La.Code Crim.P. art. 841. There was no objection to the alleged error in the present case. After the jury retired for deliberations, the jury sent a note requesting to view the map, all pictures, time stamps, video and audio. The court and counsel for the state, the defendant, and Wiltz discussed the method by which the jury could view the audio and video without any objection to the viewing itself. The jury was provided with a digital copy of the items published and a laptop to view the evidence without any objection by defense counsel. Thus, any potential error is waived for lack of objection.

For the foregoing reasons, this assignment lacks merit.

## PRO SE ASSIGNMENTS OF ERROR

The defendant filed a pro se brief requesting a review of the record for errors patent and assigning two errors as to the jury being allowed to view audio and video evidence during deliberations. As with all criminal appeals, this court has reviewed the record for errors patent. Additionally, as stated in appellate counsel's Assignment of Error Number Four, any violation of La.Code Crim.P. art. 793 was

waived for failure to object. Accordingly, the pro se claims raised by the defendant are without merit.

## CONCLUSION

The defendant's conviction is affirmed. The defendant's sentence is affirmed as amended and the trial court is instructed to enter a minute entry reflecting the sentence to be served at hard labor.

**CONVICTION AFFIRMED. SENTENCE AFFIRMED AS AMENDED.**
**REMANDED WITH INSTRUCTIONS.**